TERRI F. LOVE, Judge.
|! This appeal arises from the defendant’s convictions for second degree murder and conspiracy to commit first-degree murder. The defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence for the murder conviction and to thirty years for the conspiracy charge, sentences to run consecutively. The defendant alleged that the trial court abused its discretion by denying to sever the offenses for trial and for a new trial, that a non-unanimous verdict was unconstitutional as to the conspiracy conviction, and that the defendant was denied his right of confrontation of witnesses. We find that the trial court did not abuse its discretion by denying the severance of the offenses because the defendant was not prejudiced, that a non-unanimous verdict regarding conspiracy to commit first-degree murder is constitutional, and that the defendant was not denied his right to confront the witnesses and affirm.

*604
FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 30, 2008, Dennis Hugle shot and killed Kendall Parker. Mr. Parker sustained four gunshot wounds — two non-fatal to the torso and two mortal to the head.
The Orleans Parish Grand Jury indicted Mr. Hugle for the July 30, 2008 second degree murder of Mr. Parker. Mr. Hugle was arraigned and pled not ^guilty.[1]
Subsequently, the Orleans Parish Grand Jury issued a four count superseding indictment.[2] Count 1 of that indictment charged Mr. Hugle with the July 30, 2008 second-degree murder of Mr. Parker. In count 2, Mr. Hugle, along with his brother, Troy Hugle (“Troy”), and Tejeanne Anderson[3] were charged with conspiracy to commit the first-degree murder of an eyewitness to the murder. The remaining two counts of the indictment charged Troy with being a felon in possession of a firearm — 380 handgun — having been previously convicted of possession with intent to distribute cocaine in case number C06-43 in Obion County, Tennessee (count 3) and with being a felon in possession of a firearm — 9MM—having been previously convicted of possess with intent to distribute cocaine in case number C06-43 in Obion County, Tennessee (count 4). The three defendants were arraigned and pled not guilty.
During Mr. Hugle’s jury trial, the victim’s mother, Ms. Henrietta McCall, recalled witnessing a verbal confrontation between her son and Mr. Hugle on March 18, 2008, over repayment of a debt Mr. Parker allegedly owed to Mr. Hugle. When Mr. Parker informed Mr. Hugle that he had no money, Mr. Hugle threatened to blow Mr. Parker’s brains out if he did not repay Mr. Hugle’s “f — ing money.” Mr. Hugle retrieved a gun from his truck and continued to threaten Mr. Parker. Ms. McCall called the police. Mr. Hugle reported to the police that he did not have a weapon. However, Ms. McCall advised the police that Mr. Hugle returned the gun to his truck.
IsLieutenant Jimmy Bobb testified that he responded to a call of an aggravated assault in the 2200 block of Touro Street on March 18, 2008. Mr. Parker stated to Lieutenant Bobb that Mr. Hugle pointed a gun at him. Mr. Hugle admitted he had a weapon in his vehicle, which Lieutenant Bobb retrieved from the front seat of Mr. Hugle’s truck.
New Orleans Police Department (“NOPD”) Detective Michael Augustus conducted the investigation of the March 18, 2008 incident. Mr. Parker explained to Detective Augustus that he and Mr. Hugle co-owned a grocery store in the 2200 block of Touro Street, and that he and Mr. Hu-gle argued over money. The verbal confrontation escalated when Mr. Hugle pulled a loaded gun from the waistband of his pants and threatened to shoot Mr. Parker’s “f* * *ing brains out.” Mr. Hugle was arrested and booked with aggravated battery.[4]
On July 30, 2008, at approximately 7:00 p.m., NOPD Officer Quincy Broaden and his partner responded to a report of a homicide in the 5600 block of Dauphine *605 Street. Officer Broaden found Mr. Parker shot in the head, neck and abdomen. Mr. Parker was pronounced dead on the scene. Although Officer Broaden could not locate any witnesses, he found four bullet casings near Mr. Parker’s body.
Marvin Davis, Mr. Parker’s friend, testified that at the time of trial that he was incarcerated for a 2010 aggravated battery conviction for which he was serving a nine-year sentence and was awaiting a multiple bill hearing. Mr. Davis admitted to convictions for drug possession and carnal knowledge of a juvenile. Mr. Davis stated that he was not offered any consideration for his testimony, and that he decided to testify because Mr. Parker was his friend. Mr. Davis further | testified that he had known both Mr. Hugle and Mr. Parker for over twenty years.
Mr. Davis recounted that Mr. Parker owed Mr. Hugle money. In mid-July 2008, Mr. Parker and Mr. Davis were renovating an apartment complex that Mr. Davis owned. Mr. Hugle arrived at the complex demanding the money Mr. Parker owed. Mr. Davis intervened in the confrontation and offered to assist Mr. Parker in repaying Mr. Hugle; however, Mr. Hu-gle refused Mr. Davis’ offer and threatened to kill Mr. Parker the next time he saw Mr. Parker.
The day Mr. Parker was killed, Mr. Davis along with his nine-year old son and a friend, Kristina Brossette, drove to Gregory MeMorris’ house on Dauphine Street. When Mr. Davis exited his truck, he noticed Mr. Parker standing in the driveway. Willie Hood, Mr. Davis’ cousin, revealed to Mr. Davis that Mr. Hugle just left their location. Mr. Hugle drove up as Mr. Hood and Mr. Davis spoke. As Mr. Hugle approached Mr. Parker, Mr. Hood saw that Mr. Hugle was concealing a gun close to his leg. Mr. Hood positioned himself in front of Mr. Parker and yelled at Mr. Hugle not to shoot. Mr. Hugle threatened to shoot Mr. Hood if he did not move out of the way. As Mr. Hugle approached Mr. Parker, he stated: “I’m going to kill you.” Mr. Hugle then shot the victim four times, twice in the chest and twice in the head, and drove away. Mr. Davis, his son, Ms. Brossette and Mr. Hood fled in Mr. Davis’ vehicle. Mr. Davis did not call police immediately because he feared for his safety. The day after the shooting, Mr. Davis went to Mr. Parker’s house to tell his family about the shooting, but before he could, the police arrived. Mr. Davis gave a statement to the police and identified Mr. Hugle from a photo lineup as the shooter. Mr. Hugle and Troy, contacted Mr. Davis to discover whether Mr. Davis planned to testify at Mr. Hugle’s trial.
On cross-examination, Mr. Davis denied Mr. Hugle’s claim that the only | ^reason he testified was because he hoped to receive a lenient sentence at a pending multiple bill hearing. Mr. Davis argued that his conviction for aggravated battery, which could subject him to a life sentence, occurred after Mr. Parker’s murder and did not affect his decision to testify. Mr. Davis also stated he did not request or expect to receive anything in exchange for his testimony. He chose to testify because Mr. Parker was his friend.
On re-direct, Mr. Davis recalled that he received a telephone call from Mr. Hugle’s girlfriend, Ms. Anderson, and another from Mr. Hugle while Mr. Hugle was incarcerated, both wanting to know whether Mr. Davis was going to testify. When Mr. Davis said yes, Mr. Hugle allegedly threatened him. Mr. Davis also received a visit from Troy who was seeking the same information.
Detective Harold Wischan, the lead investigator into Mr. Parker’s murder, arrived on the scene of the shooting some *606 time after 7:00 p.m. on July 30, 2008. Mr. Parker’s body was removed, and the scene was already processed. Detective Wis-chan obtained the logistics of the shooting from the responding NOPD officers, who also provided information on the evidence collected — four spent shell casings. NOPD officers canvassed the neighborhood, but were unable to locate witnesses. Mr. Parker’s brother informed the police that Gregory McMorris was a witness to the shooting, and that he lived in the house next to where Mr. Parker was murdered. Mr. McMorris met with Detective Wischan the morning after the murder at the police station and confirmed that Mr. Davis witnessed the shooting.
Detective Wischan located Mr. Davis through Detective Orlando Matthews, who was contacted by a member of Mr. Parker’s family. Detective Matthews transported Mr. Davis to headquarters where he gave a statement and identified Mr. Hugle from a computer generated photo lineup. Based upon the information | (-supplied by Mr. Davis, Detective Wischan obtained a warrant for Mr. Hugle’s arrest.
Detective Wischan also obtained statements from the additional witnesses Delia Blount, Mr. Hood and Ms. Brossette. Ms. Brossette identified Mr. Hugle from a photo lineup, but Ms. Blount was unable to identify anyone as the shooter.
In June 2009, Detective Wischan learned of a potential conspiracy involving Mr. Hu-gle from listening to five jailhouse telephone calls between Mr. Hugle and Ms. Anderson. In one of the telephone calls, Mr. Hugle instructed Ms. Anderson to obtain information on Ms. Brossette — her address, place of employment, type of vehicle she drives, etc. — by posing as a state investigator. Other telephone calls contained conversations between Mr. Hugle, Ms. Anderson, and Troy in which Troy relayed to Mr. Hugle, through Ms. Anderson, the location of Ms. Brossette’s home and a description of her vehicle.
Detective Wischan prepared a report[5] on the relevant telephone calls and included it in an arrest report charging Mr. Hugle, Ms. Anderson, and Troy with conspiracy to commit first-degree murder of Ms. Brossette.[6] Detective Wischan subsequently prepared an arrest warrant for Ms. Anderson, and he participated in her arrest. Ms. Anderson received her Miranda rights and was transported to the homicide office where she waived her rights and gave a recorded statement. Ms. Anderson admitted her participation in the conversations heard in the recording of the jail house telephone calls. Further, Ms. Anderson stated that from those calls she understood that Mr. Hugle wanted Ms. Brossette murdered. However, she also said she did not act on any of Mr. Hugle’s directives. Ms. Anderson maintained j7that she was just the conduit of information from Mr. Hugle to Troy.
Detective Wischan also obtained an arrest warrant for Troy on the charge of conspiracy to commit first-degree murder. Because Mr. Hugle was already in custody, Detective Wischan charged Mr. Hugle with the same offense in the jail. On June 20, 2009, NOPD officers arrested Troy at his Kentucky Street residence and confiscated two handguns[7] along with numerous rounds of live ammunition.
*607 Under cross-examination, Detective Wis-chan stated that Ms. Blount witnessed the shooting because she accompanied Mr. Parker to the location where he was killed. When Mr. Parker was shot, Ms. Blount drove away in his truck. She spoke to the police the day after the shooting, and confirmed she was at the scene. However, Ms. Blount could not identify Mr. Hugle. Detective Wischan also verified that Mr. Hugle was arrested in August 2008.
On re-direct, Detective Wischan recalled that Mr. McMorris’ wife, Karen Griffin McMorris, gave a statement to Detective Michael McCleary the night of the shooting. Mrs. McMorris recounted that she was at the computer in her home when she heard several gunshots fired in front of her home. Mrs. McMorris heard a woman scream and then heard the front door knob jiggle. Mrs. McMorris looked through the peephole in the front door and saw a Caucasian female attempting to gain entrance to the home. Mrs. McMorris then saw the female run from the porch and speed away in a white vehicle.
Mr. Hood knew both Mr. Parker and Mr. Hugle for a number of years. Mr. Hood and Mr. Davis are first cousins. Mr. Hood had three or four drug convictions, and was incarcerated at the time of this trial.
|sMr. Hood testified that around noon on July 30, 2008, he and Mr. McMorris were installing tile at an apartment complex owned by Mr. Davis. Mr. Hood and Mr. McMorris worked until 2:30 p.m., and then they walked to Mr. McMorris’ house to wait for Mr. Davis to bring Mr. McMorris’ pay. About 3:00 p.m., Mr. Parker and a female drove up to the McMorrises’ home in a gray truck. Mr. Parker indicated to Mr. Hood that Mr. Davis was on his way, so Mr. Parker decided to wait. As Mr. Hood and Mr. Parker stood in front of the McMorrises’ home, Mr. Hugle drove up, briefly spoke to Mr. Hood and drove away. At that time, Mr. Parker was standing on the side of the house with Mr. McMorris. About twenty minutes later, Mr. Davis drove up in a Mercedes jeep accompanied by his young son and Ms. Brossette. Mrs. McMorris was on the porch when Mr. Davis arrived. Moments after Mr. Davis arrived, Mr. Hugle returned to the McMorrises’ home. As Mr. Hugle walked toward Mr. Parker, Mr. Hood saw a gun in Mr. Hugle’s hand. Mr. Hood jumped from the porch and asked Mr. Hugle not to shoot, but Mr. Hugle warned Mr. Hood to get out of the way or be shot. Mr. Hugle demanded his money from Mr. Parker before he shot Mr. Parker two or three times. Everyone fled the area — Mr. Davis, his son, Ms. Brossette, and Mr. Hood in Mr. Davis’ jeep, while Ms. Blount drove off in Mr. Parker’s truck.
Mr. Hood gave a statement to the police the day after the shooting and identified Mr. Hugle from a picture lineup. When Mr. Hood and Troy were incarcerated in parish prison in 2009, Troy asked Mr. Hood if he was going to testify in this matter. Mr. Hood said no because he was afraid. Mr. Hood denied being offered anything in return for his testimony.
Retired NOPD Sergeant Byron Win-bush tested the four .45 caliber cartridge cases recovered in this case. Testing proved that all of the casings were fired by lathe same gun.
Major Michael Laughlin of the Special Operations Division of the Orleans Parish Sheriffs Office testified that he was involved in criminal investigations within the jail and the transportation of inmates to and from court and the hospital. Major Laughlin listened to several telephone calls made by Mr. Hugle from jail. In one telephone call, Mr. Hugle and a female discussed putting out a “hit” on a witness. Major Laughlin notified the homicide divi *608 sion and the District Attorney. Major Laughlin then relayed the information to Detectives Pardo and Wischan, who listened to the telephone call.[8]
Ms. Anderson[9] testified that Mr. Hugle is the father of her three children. She verified that although she was charged with and pled guilty to conspiracy to commit first-degree murder, and hoped to get sentencing consideration, she was not promised anything in return for her testimony.
At trial, Ms. Anderson testified that she received ten to fifteen calls a day from Mr. Hugle while he was in jail. Ms. Anderson stated that she served only as a conduit of information from Mr. Hugle to Troy. In one of the telephone calls, Mr. Hugle is heard instructing Ms. Anderson to pose as a state investigator, go to the Ms. Bros-sette’s parents’ house and obtain Ms. Brossette’s telephone number, place of employment, type of car she drove, her movements, etc., and then relay the information to Troy. The “Plan A” referenced in one of the telephone calls referred to stalking and obtaining personal information on Mr. Brossette.- During another telephone call, Mr. Hugle instructed Ms. Anderson to go to the Ms. Brossette’s house, but she refused because she was afraid that someone at the |inlocation might see her and give her license plate number to the police.
Initially, Mr. Hugle explained to Ms. Anderson that he did not want the witness to testify. Later, however, he wanted the witness to “disappear,” to be killed. That option was called “Plan B.” Mr. Hugle directed Ms. Anderson to warn Troy not to carry any weapons until the day he was to strike/kill the witness. Mr. Hugle also gave Troy the name of the person who would supply a “throw away” gun.
Ms. Blount knew Mr. Parker only a few hours before he was murdered. Mr. Parker offered her a ride and she accompanied him to his friend’s house, but remained in his truck. Ms. Blount observed Mr. Parker speaking with two older men. About three minutes after she and Mr. Parker arrived, she heard gunshots, but she did not see the shooter. She jumped in the driver’s seat of Mr. Parker’s truck and fled the area. The following day, Ms. Blount returned to the area in Mr. Parker’s truck to find out what happened to Mr. Parker, but was stopped by the police. Ms. Blount testified that she did not make a statement to the police nor did she identify anyone in the photo lineup presented to her.
On cross-examination, however, Ms. Blount confirmed that the transcription of the statement to the police on July 31, 2008, was hers, but she maintained that she remembered very little about the day Mr. Parker died. She did not know Mr. Parker’s last name. Ms. Blount did not remember telling the police that before the shooting started, a man and woman got out of another car at the scene. Once Ms. Blount viewed the statement on the stand, she admitted telling the NOPD officers about the car the man and woman allegedly exited. Ms. Blount repeatedly testified that she smoked marijuana prior to accompanying Mr. Parker to the McMorrises’ home and that she was falling asleep in Mr. Parker’s truck.
*609 |nMs. Brossette knew Mr. Davis for about two years, but she only knew Mr. Parker, whom she met through Mr. Davis, for about two weeks prior to his death, On July 30, 2008, between 1:00 and 2:00 p.m., Ms. Brossette and Mr. Davis, accompanied by Mr. Davis’ nine-year old son, went to look at an apartment for her. They stopped at an apartment complex owned by Mr. Davis, and then they drove to Mr. Davis’ friend’s house on Dauphine Street. Ms. Brossette identified a picture of the McMorrises’ home as the location where she witnessed the murder. When they arrived at the house, they exited Mr. Davis’ truck, and Mr. Davis spoke to Mr. Parker and Mr. McMorris. While she was petting a pit bull puppy in the McMorrises’ front yard, Mr. Hugle exited a red truck and walked to the home. Ms. Brossette noticed that Mr. Hugle was armed and then heard Mr. Hood say “No, Dennis, no.” She witnessed Mr. Hugle shoot Mr. Parker twice and walk away, only to return and shoot Mr. Parker twice more in the head. She stated that Mr. Hugle then walked back to his truck like nothing happened and drove away. Everyone on the scene fled — she, Mr. Davis, Mr. Davis’ young son, and Mr. Hood drove away in Mr. Davis’ vehicle.
Ms. Brossette did not call the police immediately because she was scared, but she did report the incident the next day to Crime Stoppers, hoping to remain anonymous. However, Mr. Davis called her the day after the shooting, telling her that his vehicle’s license number was reported as one of the cars seen fleeing the scene. Ms. Brossette then accompanied Mr. Davis to the police station to recount the incident. She gave a statement in which she indicated that Mr. Davis was not the shooter, and she identified Mr. Hugle from a police photo lineup as the shooter.
Subsequently, in June 2009, the police called Ms. Brossette, reporting that they feared for her safety because they had intercepted telephone conversations I ^between Mr. Hugle and Ms. Anderson discussing where Ms. Brossette lived and worked. As a result, the police placed Ms. Brossette in protective custody.
Awood Johnson, Mr. Hugle’s friend and alleged part-time employer, testified that on July 30, 2008, Mr. Hugle accompanied him by car to Pensacola, Florida in order to work as his personal assistant during a recording session. Mr. Johnson stated that he often drove from Pensacola to pick up Mr. Hugle for work. Mr. Johnson did not recall exactly what time he and Mr. Hugle left New Orleans; however, he said it was prior to nightfall. The next morning, Mr. Johnson and Mr. Hugle learned that Mr. Hugle was wanted for murder, so they returned to New Orleans to permit Mr. Hugle to surrender to the police.
Mr. Hugle testified that the bad feelings between him and Mr. Parker began when they entered into the grocery business in March 2008. The business failed, leaving Mr. Parker allegedly owing Mr. Hugle $1,000.00. Mr. Hugle stated that there were also bad feelings between he and Mr. Davis. The two allegedly had a physical confrontation in July 2008, when Mr. Hu-gle accused Mr. Davis of scamming Mr. Hugle’s aunt.
Mr. Hugle corroborated Mr. Johnson’s testimony; however, he recalled leaving New Orleans with Mr. Johnson on July 30, 2008, at 4:00 p.m., and that by 6:45 p.m., they were almost in Pensacola, Florida. When Mr. Hugle learned he was wanted for murder, he turned himself in on August 5, 2008, so that he could allegedly prove his innocence.
Mr. Hugle admitted that he made the telephone calls the State played for the jury. However, Mr. Hugle testified that *610 his only purpose in those calls was to ensure that Ms. Brossette would testify at his trial so his attorneys could prove she was lying. Mr. Hugle stated that he pressured Troy and Ms. Anderson to contact 11sMs. Brossette with an offer of money to sign an affidavit recanting her statement. Although Mr. Hugle instructed Troy to threaten Ms. Brossette, he stated that did not mean that Ms. Brossette should be killed. Mr. Hugle telephoned Mr. Davis from jail and accused him of lying about Mr. Hugle murdering Mr. Parker.
Under cross-examination, Mr. Hugle admitted confronting Mr. Parker in March 2008 over a $1,000.00 debt. He acknowledged drawing his gun on Mr. Parker, but stated that he acted in self-defense. Further, he testified that Mr. Parker’s mother lied when she testified that she heard Mr. Hugle threaten her son.
Mr. Hugle testified that he did not know Ms. Brossette. He allegedly learned her name from the police report and Mr. Davis. In one of the jail house telephone calls to Ms. Anderson, Mr. Hugle instructed Ms. Anderson to obtain Ms. Brossette’s telephone number. Troy was to call Ms. Brossette and let her know that if she continued to lie about Mr. Hugle, that he knew where her family lived. Mr. Hugle referred to “Plan A” as stalking Ms. Bros-sette.
The State replayed recordings of the jailhouse telephone calls in which Mr. Hu-gle instructed Troy to obtain a “Roscoe” (a gun) from “Stupid” (Floyd Washington).
The jury found Mr. Hugle guilty of the second degree-murder of Mr. Parker and conspiracy to commit first-degree murder. Mr. Hugle was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence for the murder conviction and to thirty years for the conspiracy charge, sentences to run consecutively. Mr. Hugle’s appeal followed.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.
| ,MOTION TO SEVER OFFENSES
Mr. Hugle asserts that the trial court erroneously denied his motion to sever the offenses. He contends that “[wjhile evidence of the murder may be admissible in the trial of the conspiracy, the converse is not true ... evidence of the conspiracy charge was not necessary to proof of the murder charge.” Further, the joinder allowed the State to interject inadmissible evidence of weapons and Mr. Hugle’s personal history and that “... the joinder of the conspiracy and the evidence to support it was tantamount to an admission to the murder charge ... [and] the ... charges were joined solely for inflammatory and prejudicial purposes.”
A review of the record demonstrates that Mr. Hugle was not prejudiced by the joinder of offenses for trial. For the following reasons, we find that the trial court did not abuse its discretion by denying Mr. Hugle’s motion to sever.
La.C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
However, La.C.Cr.P. art. 495.1 provides that if the defendant or the State is prejudiced by the joinder of offenses in a bill of *611 information or at trial, “the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.” In State v. Nix, 07-1431, pp. 11-12 (La.App. 4 Cir. 6/18/08), 987 So.2d 855, 862, this Court cited State v. Demise, 98-0541, p. 7 (La|l/3/01),15 802 So.2d 1224, 1232, for its discussion of the standard for reviewing a trial court’s ruling on a motion to sever counts:
A motion to sever is addressed to the sound discretion of the trial court, and the court’s ruling should not be disturbed on appeal absent a showing of an abuse of discretion. [State v.] Brooks, 541 So.2d [801] at 804 [ (La.1989) ] (citing State v. Williams, 418 So.2d 562, 564 (La.1982)). In ruling on such a motion, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. Id. (quoting State v. Washington, 386 So.2d 1368, 1371 (La.1980)). However, the fact that evidence of one of the charges would not be admissible under State v. Prieur, 277 So.2d 126 (La.1973), in a separate trial on the joined offense, does not per se prevent the joinder and single trial of both crimes, if the joinder is otherwise permissible. State v. Davis, 92-1623, p. 9 (La.5/23/94), 637 So.2d 1012, 1019 (citing State v. Celestine, 452 So.2d 676 (1984)). Finally, there is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. Brooks, 541 So.2d at 805.
A defendant bears a heavy burden of proving prejudicial joinder of offenses, and he must make a clear showing of prejudice. State v. Lebreton, 03-0321, p. 13 (La.App. 4 Cir. 10/8/03), 859 So.2d 785, 794.
In State v. Carter, 99-2234, pp. 34-35 (La.App. 4 Cir. 1/24/01), 779 So.2d 125, 145, quoting State v. Lewis, 557 So.2d 980, 984 (La.App. 4th Cir.1990), |16this Court stated: “Generally, ‘there is no prejudice and severance is not required if the facts of each offense are not complex, and there is little likelihood that the jury will be confused by the evidence of more than one crime.’ ” “In many instances the trial judge can mitigate any prejudice from joinder of offenses by providing clear instructions to the jury.” State v. Labuzan, 480 So.2d 420 (La.App. 4th Cir.1985). “The prosecutor may further curtail any prejudice with an orderly presentation of evidence.” State v. Schneider, 542 So.2d 620, 621 (La.App. 5th 1989).
The record does not contain a transcript of the jury instructions. However, during the jury charge conference, the trial court judge stated that he would use jury instructions from Chapter 3 of the Louisiana Civil Treatise Criminal Jury Instructions and Procedures relative to: witness credibility; sentencing; circumstantial and direct evidence; inconsistent statements; bias; interest or corruption; burden of proof; presumption of innocence; and reasonable doubt. In addition, the trial judge informed all counsel that with regard to:
*612 ... elements and jury instruction on conspiracy charges regarding the charges themselves ... I’m going to read it directly out of the Code of Criminal Procedure and the Statutes. I believe conspiracy is listed at [La. R.S.] 14:26 ... I’m going to read the statute and tell [the jury] what the elements are ... Just as I’m going to do it on second degree murder and manslaughter and attempt.
Further, the jury returned two separate verdicts: a unanimous verdict of guilty of second-degree murder and a non-unanimous verdict on the conspiracy charge, which would indicate the jury’s ability to separate the charged offenses and its ability to return verdicts conforming to the evidence. The verdicts also suggest that the jury did not consider the evidence presented to support the murder conviction in determining its verdict on the conspiracy charge and vice versa. The | i7prosecutor made an orderly presentation of the evidence. He presented the evidence relative to the murder charge first, followed by the evidence of the conspiracy charge. Each of the witnesses testified to events relative to only one of the crimes. Therefore, we find that the jury was sufficiently apprised of its function and responsibilities to protect Mr. Hugle from being prejudiced by the joinder.
Mr. Hugle also claims that the joinder of offenses allowed the State to impermissi-bly present the evidence of the guns and ammunition seized from Troy’s residence into Mr. Hugle’s murder trial. The weapons evidence, he claims, caused the jury to view him as a “bad” person with a propensity for this type of offense. La. C.E. art. 404(B)(1).[10]
“Generally, evidence of other acts of misconduct is not admissible” because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him as “a man of bad character.” State v. Jackson, 625 So.2d 146, 148 (La.1993). Such evidence may be admissible for other purposes, such as “proof of motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident.” La. C.E. art. 404 B(l).
“A trial court’s ruling on the admissibility of evidence pursuant to La. C.E. art. 404 B(l) will not be disturbed absent an abuse of discretion.” State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220.
11sNeither the guns nor the ammunition Mr. Hugle objects to were evidence of another crime or bad act committed by him. The evidence was introduced via the testimony of Detective Wischan, the lead investigator in the murder and conspiracy charges. Detective Wischan stated that in the course of his investigation, he obtained an arrest warrant for Troy and another warrant to search his residence. Detective Wischan also testified that the execution of the search warrant at Troy’s residence yielded two guns and an assortment of ammunition.
*613 La. C.E. art. 404(B)(1) provides an exception formerly known as res gestae, for admission of evidence of other crimes “... when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” “Res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them.” State v. Taylor, 01-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741. “[A] close connexity between the charged and uncharged conduct” is required in order “to insure that ‘the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.’” State v. Colomb, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076, quoting State v. Haarala, 398 So.2d 1093, 1098 (La.1981).
In addition, res gestae or integral act evidence “incorporates a rule of ‘narrative completeness without which the state’s case would lose its narrative momentum and cohesiveness, ‘with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ’ ” Taylor, 01-1638 at 11, 838 So.2d at 741-42, quoting Colomb, 98-2813, p. 4, 747 So.2d at 1076, quoting Old Chief v. United States, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). The doctrine of res gestae is designed “ ‘to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.’ ” Taylor, 01-1638 at 10, 838 So.2d at 741, quoting Colomb, 98-2813, p. 3, 747 So.2d at 1076, quoting Haarala, 398 So.2d at 1098.
Detective Wischan’s testimony was res gestae, integral to the chain of events as they occurred in the course of his investigation; it completed the story of the crime.
Though Mr. Hugle objects to the introduction of the evidence relative to guns and ammunition, counsel for the defense questioned Detective Wischan under cross-examination about: “... the two handguns that were recovered from Troy Hugle’s house.” Detective Wischan admitted that neither of the guns was linked to the murder of Mr. Parker. Thus, we find that the trial court did not abuse its discretion by admitting the evidence of the guns.
Nevertheless, if the evidence was erroneously admitted at trial, the trial court’s ruling is subject to the harmless error analysis. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Walker, 99-2868, p. 8 (La. App. 4 Cir. 10/18/00), 772 So.2d 218, 223. The test for determining harmless error is “whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).
Mr. Hugle was identified by three eyewitnesses, two of whom had known him for many years, considered him a friend, and unequivocally testified that they witnessed him shoot and kill Mr. Parker. Ms. Brossette’s testimony indicated that | ;>nshe was standing very close to Mr. Hu-gle when he shot the victim, and she had time to get a good look at him. If there was an error, it was harmless error given the evidence of guilt presented at trial. Therefore, we find that Mr. Hugle’s assertion has no merit.

NON-UNANIMOUS VERDICT

Mr. Hugle avers that he was denied due process of law by the jury’s non- *614 unanimous verdict (10-2) on the conspiracy to commit first-degree murder charge.
La.C.Cr.P. art. 782 provides for the number of jurors composing a jury, and the number that must concur in rendering the verdict. In pertinent part, La. C.Cr.P. art. 782 states:
A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.
Conspiracy to commit first-degree murder is an offense for which punishment is confinement at hard labor. See La. R.S. 14:26.
In State v. Boudreaux, 08-1504, pp. 38 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, 1165, this Court noted:
In State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in , cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not ^presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Bertrand, 2008-2215, p. 8, 6 So.3d at 743.
This Court cited and relied on BeHrand in State v. Barbour, 09-1258, p. 16 (La. App. 4 Cir. 3/24/10), 35 So.3d 1142, 1151, to reject the argument that the trial court erred in denying the defendant’s motion to declare La.C.Cr.P. art. 782(A) unconstitutional as violative of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. Accordingly, given La.C.Cr.P. art. 782 and this Court’s previous statutory interpretation, we find that Mr. Hugle’s assertion as to the constitutionality of the conviction of conspiracy to commit first-degree murder lacks merit and affirm.

ALLEGED HEARSAY EVIDENCE

Mr. Hugle contends that the trial court erroneously allowed the admission of hearsay evidence and limited his cross-examination of witnesses thereby curtaining his right to present a defense. Specifically, Mr. Hugle objects to the State’s use of the statements of non-testifying witnesses, Mrs. McMorris and Mr. McMorris. He also asserts that the cross-examination of Mr. Hood was improperly limited.
Hearsay is defined as “[a]n oral or written assertion”, “other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” La. C.E. arts. 801. Hearsay evidence “isj^not admissible except as otherwise provided by the Code” of Evidence “or other legislation.” La. C.E. art. 802. “Hearsay is excluded because the value of the statement rests on the credi *615 bility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability.” State v. Everidge, 96-2665, p. 7 (La.12/2/97), 702 So.2d 680, 685. “[W]hen an out-of-court statement is offered for a purpose other than to establish that a true assertion has been made, the value of the statement as evidence does not depend on the credibility of the out-of-court asserter, and the statement falls outside the scope of the hearsay exclusionary rule.” State v. Wiltz, 08-1441 p. 7 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 559.
A criminal defendant has the constitutional right to present a defense. U.S. CONST, amend. 6; La. Const. Art. I § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Gremillion, 542 So.2d 1074, 1078-79 (La.1989); State v. Vigee, 518 So.2d 501, 503 (La.1988). Due process affords the defendant the right of full confrontation and cross examination of the State’s witnesses. Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). “Tt is difficult to imagine rights more inextricably linked to our concept of a fair trial.’ ” State v. Stukes, 05-0892, p. 14 (La.App. 4 Cir. 10/25/06), 944 So.2d 679, 688, quoting State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 202.
Mr. Hugle is incorrect in his assertion that the Mrs. McMorris’ out-of-court statements were erroneously admitted into evidence. The reference to a statement made by Mrs. McMorris was through the direct examination of Detective Wischan. The State questioned Detective Wischan whether Mrs. McMorris gave a statement to Detective McCleary and if so, when. Detective Wischan responded “yes” to the first question and “July 30” to the second. The State did not seek, and Detective [ ¡^Wischan did not supply, the substance of Mrs. McMorris’ statement. Neither of Detective Wis-chan’s responses equates with “introducing” Mrs. McMorris’ statement into evidence.
In addition, during cross-examination, counsel for the defense questioned Detective Wischan as follows:
And Karen McMorris did not mention to Detective McCleary that she was home when [the shooting] happened, did she?
[[Image here]]
Well, did Karen McMorris tell Detective McCleary that she was home at the time [the shooting] happened?
[[Image here]]
Well, in fact she didn’t give any information as far as her husband being there, her husband’s friends being there, her husband knowing the person who happened to be shot in their front yard? She didn’t give any of that information, did she?
On re-direct examination, the State posed the question: “Detective, on cross-examination you were asked about statements [Ms. Karen McMorris] ... gave to Detective McCleary.” Then the State asked Detective Wischan what Mrs. McMorris said in her statement. Counsel for the defense objected, denying that it had elicited the contents of Mrs. McMor-ris’ statement through Detective Wischan on cross-examination. The objection was overruled.
“Once the defense opens the door in cross examination on a subject it becomes a proper subject for redirect.” State v. Steward, 483 So.2d 155, 157 (La. App. 4th Cir.1986). “The defense may not approach a prohibited area ... and then close the door to clarification by the State.” Id.
*616 The record reflects that counsel for the defense opened the door concerning the contents of Mrs. McMorris’ statement. Consequently, because the door was [^opened, the State was entitled to ask questions on re-direct regarding the statement. Therefore, this assignment of error is without merit.
Mr. Hugle also contends that the court erroneously allowed Detective Wischan to repeat the McMorrises’ testimonial hearsay statements through Mr. Hood’s taped statement, thus denying him the opportunity to present a defense and confront and cross-examine the McMorrises.
Mr. Hugle does not specify what part(s) of Mr. Hood’s statement he claims is/are objectionable, but the prosecutor defended the admission of Mr. Hood’s taped statement arguing:
Judge ... specifically under [La. C.E. art. 801(D)(1)(B) ] that statement is admissible consist with his [Hood’s] testimony. It was offered to rebut both in [sic] express and implied charge that he had fabricated or was responsible for improperly being influenced by both Marvin Davis at the time [sic] and Marvin Davis were incarcerated, while he was incarcerated in St. Tammany. And the implication also was that they met this morning and conspired. So that statement was offered specifically to rebut that charge.
Nevertheless, a criminal defendant has the constitutional right to present a defense. U.S. Const, amend. 6; La. Const. Art. I § 16; Washington, 388 U.S. 14, 87 S.Ct. 1920; Gremillion, 542 So.2d at 1078-79; Vigee, 518 So.2d at 503. In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. U.S. Const. amend. VI. The confrontation clause bars “admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). “Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary | ^purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273,165 L.Ed.2d 224 (2006).
Mr. Hugle relies upon Michigan v. Bryant, — U.S.-, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), for support. However, his reliance is misplaced. In Bryant, police found the victim in a gas station parking lot mortally wounded. 131 S.Ct. at 1150. The victim told the police that he had been shot by the defendant at the defendant’s house and had then driven himself to the gas station parking lot. Id. At trial the officers testified about what the victim told them. Id. The defendant was convicted of second degree murder. Id. The Michigan Supreme Court reversed his conviction, holding that the Sixth Amendment’s Confrontation Clause rendered the victim’s statement inadmissible testimonial hearsay. Id. at 1151. The United States Supreme Court reversed, holding that the victim’s identification and description of the shooter and the location of the shooting were not testimonial statements because they had a “ ‘primary purpose’ ... ‘to enable police assistance to meet an ongoing emergency.’ ” Id. at 1167, quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266. Therefore, their admission at the defendant’s trial did not violate the Confrontation Clause. Bryant, — U.S. at -, 131 S.Ct. at 1152-67.
An out-of-court statement is nontestimonial and not subject to the Confrontation Clause if it “... was made ... *617 under circumstances objectively indicating that the primary purpose ... [was] to enable police assistance to meet an ongoing emergency.” Davis, 547 U.S. at 822, 126 S.Ct. 2266. To make the “primary purpose” determination, a court must objectively evaluate the circumstances in which the encounter between the individual and the police occurs and the parties’ statements and actions, i.e., at or near a crime scene or at a police station, during an ongoing ^emergency or afterwards. Id. The existence of an “ongoing emergency” at the time of the encounter is among the most important circumstances informing the interrogation’s “primary purpose.” Id., 547 U.S. at 828-30, 126 S.Ct. 2266. An emergency focuses the participants not on proving past events potentially relevant to later criminal prosecution, but on “endfing] a threatening situation.” Id., 547 U.S. at 832, 126 S.Ct. 2266. “An assessment of whether an emergency threatening the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.” Bryant, — U.S. at-, 131 S.Ct. at 1158.
The McMorrises gave statements to Detective McCleary the night of the shooting, and Mr. Hood gave a statement the next morning. Mr. Hood also testified at trial, and was available for cross-examination. Hence, the admission of Mr. Hood’s statement did not violate Crawford, supra. Nevertheless, the statements provided the sequence of events and the names of witnesses, all of which were consistent with the facts established at trial. The statements also corroborated each other. At the time the statements were given, the police were actively engaged in searching for the shooter, who was still at large and posed a danger to the police, the public and the witnesses to the shooting. See Bryant, — U.S. at-, 131 S.Ct. at 1158. The statements were nontestimonial to which the right to confrontation has no application. See Davis, supra. However, even if there was error in admitting the statement, confrontation claims are subject to a harmless error analysis. State v. Moore, 10-0314, p. 7 (La.App. 4 Cir. 10/13/10), 57 So.3d 1033, 1038-39. The evidence establishing Mr. Hugle’s guilt was substantial. Mr. Hugle was identified in photographic lineups pri- or to trial and by no less than three eyewitnesses at trial.
127Next, as to the curtailment of the cross-examination of Mr. Hood, the State objected to defense questions concerning pending criminal charges against Mr. Hood. Counsel for the defense objected because the trial court did not permit questions regarding Mr. Hood’s sentence of probation on an earlier conviction and why Mr. Hood’s probation should not be revoked in connection with a drug possession conviction.
“Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.” La. C.E. art. 609.1(B). The Louisiana Code of Evidence also provides that “particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.” La. C.E. art. 608(B). Therefore, we find no merit to this assertion.
Lastly, Mr. Hugle asserts that he was not allowed to present evidence of personal *618 bias on the part of the witnesses and their motivation for testifying at trial.
The Louisiana Supreme Court has recognized that “ ‘[a] witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.’ ” State v. Burbank, 02-1407, p. 2 (La.4/23/04), 872 So.2d 1049, 1050, quoting State v. Vale, 95-1230, p. 4 (La.1/26/96), 666 So.2d 1070, 1072. “[A] witness’s ‘hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest.’ ” Vale, 95-1230, p. 4, 666 So.2d at 1072, quoting State v. Brady, 381 So.2d 819, 822 (La.1980). Likewise,
12S[a] defendant’s right to demonstrate facts and circumstances which might influence the witness’s perceptions or col- or his testimony, thereby lessening the weight the fact-finder might accord his testimony, is guaranteed in both state and federal criminal proceedings and is an important function of the right to confront and cross-examine.
State v. Bowie, 00-3344 p. 9 (La.4/3/02), 813 So.2d 377, 385.
“Encompassed in the right of confrontation is the right of the accused to impeach a witness for bias or interest.” State v. Ex rel L.R., 10-1212, p. 6 (La.App. 4 Cir. 11/24/10), 52 So.3d 944, 948. The right to expose a “witness’ motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.” State v. Chester, 97-2790, p. 15 (La.12/1/98), 724 So.2d 1276, 1286.
If the trial court erred in the alleged curtailment of Mr. Hugle’s cross-examination designed to show bias on the part of a prosecution witness, it is subject to harmless-error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Likewise, the erroneous admission of hearsay testimony may be harmless error and is therefore subject to a harmless error analysis. See State v. Wille, 559 So.2d 1321, 1331 (La.1990). The test for determining harmless error is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, i.e., was the guilty verdict actually rendered unattributable to the error. Sullivan, 508 U.S. at 279, 113 S.Ct. at 2081, 124 L.Ed.2d 182 (1993).
Mr. Hugle was identified by three witnesses — two of whom knew him for many years, and the third testified that she was standing close to Mr. Parker when he was shot and got a good look at Mr. Hugle. The recitation of the events was the same between the witnesses and comported with the evidence; the accounting of |2aevents by each witness was consistent with the physical evidence, i.e., Mr. Parker was shot two times in his torso and twice in his head. Moreover, Mr. Hugle admitted acting to prevent an eyewitness from testifying at trial.
Eyewitnesses Mr. Davis and Mr. Hood testified that they had no motivation to lie even though both had criminal histories. Both testified that the prosecutor made them no promises in exchange for their testimony. They unequivocally identified Mr. Hugle the day after the shooting. Further, the jury heard the testimony of the State’s witnesses and that of Mr. Hu-gle. The jury did not abuse its discretion by crediting the testimony of the State’s witnesses over that of Mr. Hugle. This Court has repeatedly held that “[a] fact finder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence.” State v. Huckabay, 00-1082, p. 33 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111.
*619 Viewing the evidence and testimony adduced at trial, we conclude, beyond a reasonable doubt, that the jury’s verdict was not attributable to any confrontation-related harmless error. Therefore, we find that Mr. Hugle’s assertion regarding the confrontation of witnesses does not warrant reversal and affirm.

DECREE

For the abovementioned reasons, we find that Mr. Hugle’s motion to sever offenses was correctly denied by the trial court, that his non-unanimous conviction for conspiracy to commit first-degree murder was constitutional, and that any errors related to Mr. Hugles’ right to the confrontation of witnesses constituted harmless error. Accordingly, we affirm.
AFFIRMED

. Following the return of a superseding indictment, the State entered a nolle prosequi as to the original indictment, (case number 482-304).

. The proceedings under the superseding indictment bore docket number 488-190 and went to trial on January 24 through January 27, 2011.

. Ms. Anderson is identified as the mother of the defendant's children.

. The case related to the incident was dismissed.

. The jury reviewed the report on the telephone calls.

. In one of the telephone calls, the co-conspirators discussed that without Ms. Brossette's testimony, the State had no case. They also discussed obtaining a "throw away” gun.

.Neither of the weapons was linked to either charge in this case. In fact, the weapon used to kill Mr. Parker was never recovered.

. The recording of the telephone call was played for the jury.

. The police arrested Ms. Anderson at her home on June 19, 2009, and questioned her at the homicide office concerning a conspiracy to murder Ms. Brossette. Based upon the statement Ms. Anderson gave to the police, she was arrested on conspiracy to commit first-degree murder.

. La. C.E. art. 404(B)(1) provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.