On the day of the shooting, Ms. Mayer deposited her child at her mother's house at 7:05 a.m. As Ms. Mayer was leaving, she saw what she thought was a couple arguing across the street from her mother's house. Seconds afterwards, Ms. Mayer heard Ms. Hedgepeth screaming and then saw Ms. Hedgepeth struggling with the suspect, who was standing next to Ms. Hedgepeth's car. Ms. Mayer ran toward the commotion. The suspect reached in and out of Ms. Hedgepeth's vehicle while Ms. Hedgepeth was seated in the car. Then Ms. Mayer saw the victim run from the corner of Eliza and Vallette Streets to help Ms. Hedgepeth. By that time, Ms. Hedgepeth had exited the vehicle, and the suspect had entered. The victim jumped on the hood of Ms. Hedgepeth's car, hitting and kicking the windshield. A shot was fired. The victim jumped from the hood of the car, alerting Ms. Mayer and Ms. Hedgepeth that the suspect was armed and had shot him. The victim ran across the street and collapsed on the lawn of a nearby house. Ms. Mayer ran under some steps and watched the suspect, who was wearing a gray hoodie, run toward the river. Ms. Mayer went to the unconscious victim's aid. She attempted to staunch the bleeding from the victim's torso by applying pressure to the wound. Just then, the victim's young sons ran to the victim and attempted to speak to him. EMS personnel arrived but despite their efforts could not revive the victim.
NOPD expert firearm examiner, Ms. Meredith Acosta, examined four unknown caliber copper jacket fragments (specimens 1, 2, 3 and 5), three fired 9mm caliber cartridge cases, two fired casings (specimen 4) and one fired casing (specimen 6) and a bullet retrieved during the victim's autopsy (specimen 7). Ms. Acosta opined the casings retrieved from the shooting scene were fired from a 9mm semi-automatic weapon and confirmed that she did not examine a weapon related to this case.
Corporal Kay Harrell testified she was employed by the Orleans Parish Sheriff's Office as the supervisor of the records division of the NOPD Intake and Processing center. Corporal Harrell's duties involved updating all inmate files, keeping track of probation, parole and release of inmates. Through her computer, Corporal Harrell was able to access information related to the locations of inmates. On July 30, 2014, the Orleans Parish District Attorney's Office asked her to determine the defendant's and Joshua McReynolds' location histories.
The booking date on the defendant's location records was February 28, 2012. Further, the defendant's record indicates he was housed in Templeman 5, A-1, Cell-1 of Orleans Parish Prison from May 27, 2012 to June 20, 2012.
Joshua McReynolds' location history reflected he was booked on June 15, 2011, and housed in the same cell with the defendant from June 6, 2012, to June 12, 2012.
Joshua McReynolds testified that he pled guilty to armed robbery on June 25, 2012. He was incarcerated in the Orleans Parish Prison, serving a twenty-year sentence at the time of the trial in this case. During a portion of his time in jail, Mr. McReynolds was in the same cell as the defendant, who related to Mr. McReynolds that he had shot a man while carjacking a woman. The defendant referred to the killing as the "good Samaritan murder." Mr. McReynolds recounted that the defendant questioned him about his knowledge of forensic evidence, specifically DNA. The defendant explained that he had wiped *413 down the car but may have dropped a cigarette butt at the shooting scene. When Mr. McReynolds questioned the defendant about what it felt like to kill a man, the defendant replied it was just like shooting a bird with a BB gun.
Jim Huey testified that he worked at the Orleans Parish Sheriff's Department and was the custodian of records of inmate telephone calls. He stated that the phone calls of the inmates are recorded on an internet-based system and stored on a secured database. Mr. Huey testified that when an inmate makes a call, the inmate must use a pin/folder number that was issued to the inmate at booking. One of Mr. Huey's duties is to provide law enforcement agencies copies of an inmate's jailhouse telephone calls. Mr. Huey explained that as an inmate makes a call from the Orleans Parish Prison, the inmate is issued a warning that the call will be monitored and recorded. Mr. Huey also noted that a call detail sheet, which lists the specifics of an inmate call, i.e., name of caller, time, duration, number called, etc., accompanied the recording of jailhouse calls. Pursuant to the State's request, Huey supplied a disc containing a recording of four calls the defendant placed in the first week of March 2012 while incarcerated at Orleans Parish Prison.[1]
Jeremy Ballard testified that on the morning of January 25, 2012, he arrived at his glass studio in Algiers Point at approximately 6:50 a.m. His shop was located on the corner of Vallette and Eliza Streets. At approximately 7:00 a.m. that day, Mr. Ballard heard what he thought were four gunshots. He walked out of his shop to investigate and saw two children running in the street. Mr. Ballard recognized the children from the neighborhood because he had seen them with their father on previous mornings waiting on the corner for their school bus. Ballard ran toward the children as the suspect ran across Vallette Street toward Eliza Street. When the suspect tripped on the sidewalk, Mr. Ballard noticed the suspect was wearing red plaid boxer shorts. Mr. Ballard followed the suspect in his car. However, Mr. Ballard lost sight of the man momentarily and drove around the area until he saw the suspect again on Sequin Street. The suspect met a man on Opelousas Street, and the two walked to Teche Street. Thereafter, the pair walked back to Vallette Street, and Mr. Ballard lost sight of them; however, as Mr. Ballard was following the men, he called 911, reported the situation and provided a description of the suspect's clothing-tan pants and dark brown leather jacket. Mr. Ballard then drove back to his shop. When the police arrived at his shop, Mr. Ballard accompanied them in the patrol car, retracing the suspect's flight route. Mr. Ballard said he viewed the suspect from a vantage point of no more than twenty feet; however, Mr. Ballard was unable to make an identification from the photo lineup the police presented him.
Troy Dickerson, the NOPD expert crime scene and fingerprint analyst, testified he was called to the shooting scene. By the time he arrived, crime scene technicians had already begun photographing and processing the area. Mr. Dickerson photographed and processed Ms. Hedgepeth's vehicle. He swabbed the vehicle's driver side door handle, steering wheel, radio knob, gear shift, AC switch and driver's side arm rest for DNA. Mr. Dickerson also processed the vehicle for latent fingerprints *414 and hair and fibers. The swabs and samples taken during the process were sealed, identified and placed in Central Evidence and Property for further processing/testing.
Sergeant Jeff Rodrigue of the Homicide Division of the Jefferson Parish Sheriff's Office testified that in January and February 2012, he was assigned to the New Orleans FBI Violent Crimes Task Force. Sergeant Rodrigue assisted Detective Tanisha Sykes in obtaining a buccal swab from the defendant.
Acadiana Crime Lab forensic DNA analyst Jeremy Dubois tested the swab samples obtained by Troy Dickerson from the Hedgepeth vehicle. Mr. Dubois also performed DNA testing on the blouse Ms. Hedgepeth wore the day of the shooting. He issued a report of his test results on February 8, 2012. Mr. Dubois explained that he obtained reference DNA samples from Ms. Hedgepeth and the defendant for comparison with profiles obtained from swab samples. Testing on the steering wheel swab revealed the presence of DNA for both Ms. Hedgepeth and the defendant. Mr. Dubois opined that based on statistical analysis, the probability the male DNA found on the steering wheel being deposited by anyone other than the defendant was one in 73.7 million within the African American population.
The defense offered the testimony of the defendant's father, Mr. Michael Willis, who informed the jury that the defendant had been missing a tooth since junior high school.[2] He also denied that the defendant was a killer.
Detective Sykes was called by the defense and confirmed she was the lead detective in this case. The detective admitted failing to have the witnesses who viewed a photographic lineup sign the back of the photos if no identification was made; however, she reiterated she noted in her report the procedure employed in displaying the photo lineups and whether an identification was made by the witness.
ERRORS PATENT
In accordance with La. C.Cr.P. art. 920, all appeals are reviewed for errors patent on the face of the record. Our review of the record reveals one with regard to the defendant's sentence for armed robbery. In the indictment, the State invoked the firearm sentence provision of La. R.S. 14:64.3, which provides that when a firearm is used in the commission of an armed robbery or attempted armed robbery, the "offender shall be imprisoned for an additional period of five years without benefit of parole, probation, or suspension of sentence." See State v. Bartley , 2017-0273 (La. App. 4 Cir. 10/11/17), --- So.3d ----, 2017 WL 4534407. The trial court sentenced the defendant to forty-five years at hard labor without benefit of probation, parole, or suspension of sentence for the count of armed robbery with a firearm. However, the trial judge did not specify whether the sentence imposed included the enhanced term of imprisonment under La. R.S. 14:64.3. A sentence is indeterminate when the trial court fails to impose a consecutive five-year enhancement as mandated by La. R.S. 14:64.3. See State v. Burton, 2009-0826, p. 3 (La. App. 4 Cir. 7/14/10), 43 So.3d 1073, 1076.
Therefore, we vacate the defendant's sentence for armed robbery with a firearm and remand the matter for resentencing or clarification as to whether the sentence includes any additional punishment as prescribed by La. R.S. 14:64.3. See *415 State v. Amos , 2015-0954, pp. 5-6 (La. App. 4 Cir. 4/6/16), 192 So.3d 822, 826-827.
ASSIGNMENT OF ERROR NUMBER 1
In the first of four assignments, the defendant complains his convictions are based upon circumstantial evidence, and that the State failed to exclude every reasonable hypothesis of innocence. The defendant does not deny that the crimes occurred, only that the State failed to prove his identity as the shooter, noting that no one identified him, and that the police found no gun or other incriminating evidence when the police searched his home.[3]
This Court, in State v. Hickman , 2015-0817, p. 9 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1165-1166, set forth the standard for determining a claim of insufficiency of evidence as follows:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal , [20] 00-0674 (La. 6/29/01), 796 So.2d 649, 657 (citing State v. Captville , 448 So.2d 676, 678 (La.1984) ).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Neal , 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere , 488 So.2d 965, 968 (La. 1986) ).
"If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted." State v. Green , 588 So.2d 757, 758 (La. App. 4th Cir. 1991). It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Scott , 2012-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508 (citing State v. Johnson , 619 So.2d 1102, 1109 (La. App. 4 Cir. 1993) ). "The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." State v. Richards, 2011-0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869 (citing State v. Vessell, 450 So.2d 938, 943 (La. 1984) ). Conflicting statements as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244, 1249 (La. App. 4th Cir. 1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id.
*416 The defendant herein maintains his convictions are baseless because none of the State's witnesses, who viewed photo lineups, were able to identify him as the perpetrator of these crimes.
Ms. Hedgepeth testified she viewed her assailant for a few moments and added that he was armed, demanded she surrender her car and ultimately struggled with her as he pulled her from the car and grabbed her purse. Moreover, Ms. Hedgepeth was able to compile a sketch of her assailant and her clothing description of the perpetrator she provided matched the description supplied by other witnesses-khaki pants and gray hoodie.
Ms. Robin Mayer who was a few houses away from the shooting scene also noted that the shooter wore a gray hoodie.
Detective Sykes testified about the impounding and processing of Ms. Hedgepeth's vehicle. Detective Sykes reported that DNA lifted from the car's steering wheel by the crime lab revealed a male genetic profile. Detective Sykes indicated that the victim's two young sons drew sketches of the perpetrator, and, in fact, one of those sketches was released to the news media to assist in the search for the shooter. During the course of her investigation, Detective Sykes obtained a buccal swab from the defendant for testing and based upon those results, a warrant was issued for the defendant's arrest. When police arrested the defendant, he was wearing plaid boxer shorts, like the ones Jeremy Ballard saw the suspect wearing at the time of the shooting. Additionally, a search of the defendant's residence produced several pairs of khaki pants and a gray hoodie.
Joshua McReynolds recalled that he and the defendant were housed in the same cell in the Orleans Parish Prison for approximately two days in late May or early June 2012, during which time they spoke about the charges against the defendant. Mr. McReynolds recounted the defendant asking him about forensic evidence and how it could be used to link a person to a crime. The defendant admitted to Mr. McReynolds that he was carjacking a lady when a man came and got in the defendant's way. The defendant claimed he did not intend to shoot the victim. Moreover, the defendant told Mr. McReynolds that the media referred to the shooting as the "Good Samaritan" case. The defendant explained to Mr. McReynolds that he wiped the car down but said he may have dropped a cigarette butt or left some other evidence behind, and that was why he was asking Mr. McReynolds about different types of forensic evidence. When Mr. McReynolds asked the defendant what it felt like to shoot someone, the defendant described it as shooting a bird with a BB gun.
Additional proof of the State's case came from the DNA evidence obtained from Ms. Hedgepeth's car. Acadiana Crime Lab forensic DNA analyst Jeremy Dubois explained the science of DNA and provided examples of where DNA may be found in the human body-skin, saliva, white blood cells, bone, and seminal fluid. From statistical analysis of the test results, Mr.Dubois opined that the probability the male DNA found on the steering wheel of Ms. Hedgepeth's vehicle being deposited by anyone other than the defendant was one in 73.7 million in the African American population.
In addition, Troy Dickerson, the NOPD expert crime scene and fingerprint analyst, concluded that the gunshot which shattered the Hedgepeth vehicle's windshield, and killed the victim, was fired by the defendant while seated in the vehicle.
Based upon the uncontroverted DNA evidence in this case, coupled with the testimony of Joshua McReynolds and the other State's witnesses, viewing the evidence *417 in the light most favorable to the State, it was not unreasonable for the jury to conclude that the defendant shot the victim and robbed Ms. Hedgepeth while armed with a gun. This assignment is meritless.
ASSIGNMENT OF ERROR NUMBER 2
By this assignment, the defendant argues that the trial court erred in denying his challenges for cause to jurors Ms. Schenck and Ms. Cox.[4] The defendant challenged those jurors on the ground that they could not be fair and impartial because their responses to questioning revealed that they would consider the defendant's failure to testify in determining guilt.
Louisiana Constitution article I, section 17 guarantees a defendant the "right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." State v. Juniors , 2003-2425, p. 7 (La. 6/29/05), 915 So.2d 291, 304. The number of peremptory challenges granted to a defendant in a trial of an offense punishable necessarily by imprisonment at hard labor, as in this case, is fixed by law at twelve. See La. Const. art. I, § 17 (A); La. C.Cr.P. art. 799. When a defendant uses all twelve of his peremptory challenges, an erroneous ruling by a trial court on a challenge for cause that results in depriving the defendant of a peremptory challenge constitutes a substantial violation of the defendant's constitutional and statutory rights, requiring reversal of the conviction and sentence. Juniors, 2003-2425 at 7-8, 915 So.2d at 304 ; see La. C.Cr.P. art. 921 ("A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."). Therefore, prejudice is presumed when a challenge for cause has been erroneously denied by a trial court, and the defendant exhausts all peremptory challenges statutorily afforded to the defendant. Juniors , 2003-2425 at 8, 915 So.2d at 305 (citing State v. Robertson , 92-2660, p. 3 (La. 1/14/94), 630 So.2d 1278, 1280, and State v. Ross , 623 So.2d 643, 644 (La. 1993) ). In summary, where all peremptory challenges have been used, as in this case, a defendant need only demonstrate the erroneous denial of a challenge for cause to establish reversible error warranting reversal of a conviction and sentence. Juniors , 2003-2425 at 8, 915 So.2d at 305.
A defendant may challenge a juror for cause if "[t]he juror is not impartial, whatever the cause of his partiality." La. C.Cr.P. art. 797(2). A "juror [who] will not accept the law as given to him by the court" may also be challenged for cause by the defendant. La. C.Cr.P. art. 797(4). In State v. Dotson , 2016-0473, (10/15/17), 234 So.3d 34, the Louisiana Supreme Court noted that:
Voir dire examination of prospective jurors is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges. State v. Drew , 360 So.2d 500, 513 (La. 1978). The questions propounded are designed to determine any potential adverse influence on the prospective juror's ability to render an impartial verdict. See Id. A prospective juror's responses during voir dire cannot be considered in isolation. See State v. Frost , 97-1771, p. 8 (La. 12/1/98), 727 So.2d 417, 426.
A trial judge is vested with broad discretion in ruling on challenges for *418 cause, and such a ruling is subject to reversal only when a review of the entire voir dire reveals the judge abused his discretion. Robertson , 630 So.2d at 1281. The trial judge's refusal to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. Id.
Clearly, La. C.Cr.P. art. 797(2) does not require that a prospective juror state with absolute certainty that he/she cannot be impartial in order to be removed for cause. However, in the absence of such a statement, the trial court's denial of a challenge for cause will not be reversed if, on review of the entire voir dire examination, the prospective juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. Passman , 345 So.2d 874, at 880. Reversal is appropriate only where it appears, upon review of the voir dire examination as a whole, that the trial judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused., Id. See State v. Dorsey, 10-0216, at 28, 74 So.3d 603, at 625 ; State v. Lee , 93-2810 (La. 5/23/94), 637 So.2d 102, 108. This standard of review is utilized "because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys." Lee, 93-2810 at 9, 637 So.2d at 108. "Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record." Id. As noted in State v. Miller , 99-0192 (La. 9/6/00), 776 So.2d 396, because of the "complicated and oftentimes daunting" task faced by a trial court in deciding "challenges for cause of prospective jurors who give equivocal ... responses during voir dire ," "an appellate court should accord great deference to the [trial] court's ruling on a challenge for cause, which is necessarily based, in part, on the court's personal observations during questioning." Id., 99-0192 at 14, 776 So.2d at 405-06.
In the case sub judice , during voir dire , defense counsel queried the prospective jurors:
... does anyone believe ... [the defendant] ... needs to testify? You just got to hear from him .... He is not required to testify, but you still believe ... if he is convicted he's going to die in Angola, "I want to hear from him." "I want to hear from him even though the law says he would not have to testify."
Ms. Schenck and Ms. Cox responded as follows:
MS. COX: Let me tell you why.
DEFENSE: And I want you to make this clear.
MS. COX: Okay. If my life was on the line, I would do anything I had to; testify, stand on my head, whatever. That's the only reason because I think it's worth it to him. I think I would feel more towards his innocence if he was willing to defend his own claim.
DEFENSE: Even though the law says he does not have to, you would still want to hear from him?
MS. COX: I'm saying I would like to hear from him. I'm not saying I have to hear from him. I know what the law says. You are telling me what the law says. You just asked for an opinion and I said I would like to hear from him.
DEFENSE: Ms. Schenck?
*419 MS. SCHENCK: Part of her answer is that I felt if I ever did something I would want to say my peace (sic). I understand it's the law. I don't know how to separate it from something in the back of my mind saying, "Why wouldn't he want to speak up?" I know it's the law and understand that, but I just have that little part in my brain I can't separate from the law.
DEFENSE: So you all would basically be impressed by a defendant who comes up and takes the stand in their own defense?
MS. COX: Because he feels that strongly, "I'm innocent. And I will tell you I'm innocent. And I will tell you why I'm innocent." And if I hear it from him that will go a lot in my direction in impressing me. "Impress" seems a little frivolous, but it would weigh a lot.
DEFENSE: So the State has proven its case beyond reasonable doubt just because the defendant comes up you will be impressed with him.
MS. COX: But the defendant coming up is your decision, not mine.
DEFENSE: But you would be impressed with it if he came up?
MS. COX: I would probably-it would add some weight to my decision, yes.
Ms. Cox's and Ms. Schenck's responses disprove the defendant's contention that each "unequivocally" stated they would treat the defendant more favorably if he took the stand. In particular, Ms. Cox, who was employed by a law firm, stated that she "did not have to" but "would like" to hear from the defendant and that she understood that the law did not require him to testify. Ms. Schenck, an attorney, expressed the opinion that if she were on trial she would testify, but like Ms. Cox, she said she understood the law did not require the defendant to testify.
In State v. Passman , 345 So.2d 874, 879-80 (La. 1977), a prospective juror responded that he might be influenced by whether the defendant took the stand on his own behalf, implicating La. C.Cr.P. art. 797(4). Furthermore, when asked if he would have trouble following the trial judge's instruction not to consider whether the defendant testified in weighing the defendant's guilt, the prospective juror in Passman indicated that he "may have trouble and [he] may not." However, on further questioning by the trial judge, the prospective juror clarified that he would accept and apply the law in deciding whether the defendant is guilty. The Supreme Court found no abuse of discretion in the denial of the defendant's challenge for cause.
In State v. Frazier , 283 So.2d 261, 263-64 (La. 1973), an equivocal answer given by the prospective juror ("I could try.") to the trial judge's question, "If [defendant] did not take the stand do you feel that you could return a fair and impartial verdict based on the evidence and the testimony that you did hear," did not amount to a refusal to accept the law as charged so as to implicate La. C.Cr.P. art. 797(4).
Recently, in State v. Wells , 2014-0612 (La. App. 4 Cir. 9/14/16), 203 So.3d 233, 305, writ denied , 2016-1939 (La. 9/6/17), 224 So.3d 988, cert. denied , Wells v. La. , --- U.S. ----, 138 S.Ct. 995, 200 L.Ed.2d 268, 2018 WL 942610 (2/20/18), this Court concluded that a juror who expressed her unfavorable view on a defendant's failure to testify was not required to be removed for cause where her responses during voir dire indicated that she could follow the court's instructions, comply with her oath as a juror, and put considerations of the defendant's failure to testify out of her mind when determining guilt or innocence.
Neither Ms. Cox nor Ms. Schenck gave any indication she could not be impartial *420 and fair to the defendant. Ms. Schenck told the prosecutor that she would have to hear all of the evidence before she could make a determination of the defendant's guilt. Ms. Cox averred she would serve as a fair and impartial juror. Further, both Ms. Cox and Ms. Schenck said that if chosen as jurors, they would devote their undivided attention to the trial.
Based upon Ms. Cox's and Ms. Schenck's overall responses during voir dire that they could follow the law and be impartial and fair to the defendant, the trial court did not err by denying the defendant's challenges to those jurors. This assignment has no merit.
ASSIGNMENT OF ERROR NUMBER 3
In this assignment, the defendant argues the trial judge abused his discretion by failing to grant the motion for mistrial based upon the defendant's argument that the State was guilty of shifting the burden of proof.
The defendant claims the burden shifting occurred during the State's redirect questioning of Jeremy Dubois, its DNA expert, who testified that, when the lab finishes its testing, it keeps a portion of the DNA extract for further testing in case there is an appeal and third-party testing is sought. The defense objected to the mention of an appeal, and the judge sustained the objection. Then, when the judge allowed the witness to respond that one-half of the extract was reserved in case the defense sought independent testing, the defense objected and accused the witness of "shifting ...the burden [of proof], sort of." The judge overruled the objection, and the defense requested a mistrial, which was denied. The trial court thereafter refused defense counsel's request for a curative instruction.
"Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La. C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown." State v. Castleberry, 98-1388, p. 22 (La. 4/13/99), 758 So.2d 749, 768. "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." State v. Maxwell , 2011-0564, p.25 (La. App. 4 Cir. 12/21/11), 83 So.3d 113, 128.
The State explained its redirect questioning of Mr. Dubois, noting that it did not raise the issue on direct examination, but rather that defense counsel "opened the door" during its cross-examination when he asked Mr. Dubois whether additional testing, other than that performed by the State, of the DNA evidence was possible. The State pointed out that it raised the issue on redirect examination merely to afford Mr. Dubois the opportunity to clarify his response to the question posed during cross-examination. See State v. Overton, 337 So.2d 1201, 1206 (La.1976) ("The court correctly ruled that defense counsel had opened the door to this area on cross-examination and that it was a proper subject for redirect examination ... Where defense counsel went on cross-examination, the State had the right to follow on redirect."); State v. Hugle, 2011-1121, p. 23 (La. App. 4 Cir. 11/7/12), 104 So.3d 598, 615 ("Once the defense opens the door in cross examination on a subject, it becomes a proper subject for redirect", quoting State v. Steward, 483 So.2d 155, 157 (La. App. 4 Cir.1986) ). Moreover, the defendant's accusation of burden shifting is unfounded. Mr. Dubois' response as to why a portion of the DNA is reserved for further testing was given in explanation of *421 usual operating procedure, not as the defense claims, to assert the defense had any obligation to perform testing on the sample or to prove his innocence. Mr. Dubois specifically indicated a sample quantity was reserved in the event the defendant chose to contest the DNA test results.
Evening assuming the State's questioning on re-direct was improper, the defendant has not shown any prejudice. Defense counsel strenuously impressed upon the jury that the defendant was constitutionally shielded from proving his innocence and had no obligation to perform any testing of evidence.
The uncontroverted DNA and testimonial evidence in this case proved the defendant guilty of second degree murder and armed robbery. The defendant's accusations of "burden shifting" is unfounded. The trial court did not err in its ruling.
ASSIGNMENT OF ERROR NUMBER 4
In a final assignment, the defendant complains of sentencing errors.
First, the defendant contends the trial court erred by imposing sentence for his second degree murder conviction with the prohibition of parole eligibility for a stated term of years. The defendant argues the trial court's decision to deny him parole eligibility for forty-five years is contrary to State v. Montgomery, 2013-1163 (La. 6/28/16), 194 So.3d 606 (per curiam ) and circumvents La. R.S. 15:574.4E(1).[5] This portion of this assignment of error has merit.
Here, the trial judge conducted a Miller hearing on July 8, 2015, and on September 18, 2015, sentenced the defendant to the mandatory sentence of life imprisonment at hard labor, with the possibility of parole after serving forty-five years.
A conviction for second degree murder in Louisiana, La. R.S. 14:30.1 mandates a sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. However, in 2012 the United States Supreme Court, in Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012), held that a state's statutory sentencing scheme that mandates life imprisonment without parole, for those offenders under the age of eighteen years at the time they committed a homicide, violates the Eighth Amendment prohibition of "cruel and unusual punishment."[6] The Miller Court did not prohibit life imprisonment without parole for juveniles, but instead required that the statutory sentencing scheme authorize a sentencing court to consider an offender's youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest penalty for juveniles who have committed a homicide. State v. Simmons, 2011-1810, p. 2 (La. 10/12/12), 99 So.3d 28 (per curiam ).
In 2013, in response to Miller v. Alabama, supra, the Louisiana Legislature *422 enacted La. C.Cr.P. art. 878.1[7] which required the district court to conduct a hearing "[i]n any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder or second degree murder where the offender was under the age of eighteen years at the time of the commission of the offense ... to determine whether the sentence shall be imposed with or without parole eligibility pursuant to the provisions of La. R.S. 15:574.4(E)(1)."
The State concedes that the trial court exceeded its authority by imposing its own period of imprisonment to be served by the defendant before he could become eligible for parole. However, the State contends amending the sentence is not the proper remedial action. Instead, the State advocates that the matter be remanded for another Miller sentencing hearing to determine "whether the defendant should be eligible for parole in the first place." The State reasons "[I]t is presumptuous to assume that just because the trial court awarded the defendant parole eligibility initially, it would rule the same way with the knowledge that the defendant would be parole eligible at least ten, if not twenty, years earlier than with the initial sentence." Id. The State supports its position citing the trial court's observations of the defendant as one of the worst offenders.
Prior to sentencing on the second degree murder conviction, the trial judge addressed the defendant:
Mr. Harrison, after this Court conducted a [ Miller ] ... this court heard compelling testimony from both the victim's family and your own, and at that hearing, testimony which clearly shows that you have forever adversely affected the life course of an entire family. You brutally and callously took the life of [the victim]. When you did that, you took a husband from his wife, you took a son from his mother, you took a father from his son, you took a friend and worthy asset of Algiers ... Yet, despite the moving testimony of all people affected, you sat on this witness stand and did not display a single iota of remorse for the heinous and senseless killing for which you were convicted. By your heatful (sic) action, you have instilled fear in both the [victim's family] and this entire community.
No grandmother raising her child ever envisions the child growing up to be a criminal defendant, much less a convicted murderer. Make no mistake, you have forever damaged the psyche of both the [victim's family] and your own family. Indeed, you have visited an eternal plague upon bothouses. Your violent criminal actions not only in this case, but one in which you attempted to commit an armed robbery, does not escape this judge's conscience or attention.
Balancing this with your youth and lack of parental guidance as a child, the Court finds that serving 45 years, flat, hard time, before being eligible for parole serves the interest of justice.
In this case, the district court possessed the authority to sentence the defendant *423 to life imprisonment without parole but instead elected to restrict parole eligibility for a fixed number of years. While that specific restriction on parole eligibility on the life sentence was unauthorized by law, as a result of his armed robbery sentence, the court has already imposed a sentence that ensures the defendant will not be released before he serves forty-five years in state custody. Only then might the defendant become eligible for parole (provided he has satisfied the conditions set out in La. R.S. 15:574.4(E) ), which in any case does not suggest that he will ever be released during his lifetime. Given the forty-five-year, parole-ineligible sentence on the armed robbery count, will give effect to the court's intent that the defendant not be released earlier, a remand to the district court for another Miller hearing, at which time the court would have the opportunity to impose a harsher term (life imprisonment without parole), is unwarranted in this case. Cf. North Carolina v. Pearce , 395 U.S. 711, 726, 89 S.Ct. 2072, 2081, 23 L.Ed.2d 656 (1969) (imposition of a greater sentence after a retrial leads to presumption of impermissible vindictiveness based on the exercise of the constitutionally protected right unless the court sets forth for the increase, based upon "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding.")
The second sentencing error complains that the defendant was sentenced to serve forty-five years at hard labor on the armed robbery conviction, but the trial judge failed to address his parole eligibility as to that sentence.
There is no indication in the record that the trial court ordered that the defendant's sentence for armed robbery be served without benefits as statutorily mandated. See La. R.S. 14:64. However, even if the trial court failed to articulate those restrictions at sentencing, the error does not require corrective action by this Court. La. R.S. 15:301.1(A) and (C) provide that the statutory restrictions are included in the sentence given regardless of whether they are specifically imposed in the sentencing court. See State v. Williams , 2000-1725, pp. 14-15 (La. 11/28/01), 800 So.2d 790, 801.
Moreover, to the extent that the defendant relies on State ex rel. Morgan v. State , 2015-0100 (La. 10/19/16), 217 So.3d 266, 270-271, which held that a ninety-nine-year, parole-ineligible term for a non-homicidal offence committed by a juvenile violated due process because it effectively denied the offender the possibility of release during his lifetime, for the proposition that his forty-five-year sentence is likewise unconstitutional, because the term guarantees him release by the time he will be aged sixty-two, his claim lacks merit. In addition, unlike the offender in Morgan , the defendant has also been convicted of homicide, and has received a life (parole-eligible) sentence for that offense.
This portion of this assignment of error has no merit.
MOTION TO DISMISS THE APPEAL
On October 12, 2017, the State filed a motion to dismiss the defendant's appeal on the basis it was untimely. On October 19, 2017, this Court ordered that the merits of the motion to dismiss be determined in conjunction with this appeal.
The State argues the defendant's appeal is untimely because his convictions for second degree murder and armed robbery with a firearm became final on November 4, 2015, the date he was sentenced. The State notes that La. C.Cr.P. art. 914(B)(1) mandates that an appeal must be made no later than thirty days after rendition of judgment or ruling from which the appeal is taken. The State points out that *424 the defendant exceeded the time limitation implemented by La. C.Cr.P. art 914(B)(1) because the defendant's motion for appeal was not filed until March 1, 2016, one hundred eighteen days after the date his convictions became final.
The appropriate procedural remedy for a defendant seeking to exercise his right to appeal after his conviction and sentence become final is a timely-filed application for post-conviction relief seeking an out-of-time appeal pursuant to La. C.Cr.P. art. 924 - 930.7. State v. Gray, 2004-1272 (La. App. 5 Cir. 4/26/05), 902 So.2d 1060, 1061.
There is no indication in the record that the defendant ever intended to waive his constitutionally protected right to appeal his convictions and sentences and he would be entitled to an out-of-time appeal pursuant to State v. Counterman, 475 So.2d 336, 338 (La. 1985), in which the Supreme Court acknowledged the "constitutional right to appeal (or to other review on the record) in criminal cases in Louisiana when the defendant is to be subjected to imprisonment or fine" under La. Const. art. I § 19. Id. , 475 So.2d at 339. The Court also noted that there exists no precise statutory authority for providing relief to convicts who have suffered a deprivation of their right to appeal. Id., at 340. The court proceeded to craft a rule according to which:
The trial court may grant post conviction relief reinstating defendant's constitutional right to appeal after the time for appealing has elapsed, after due consideration of such facts as the length of the delay in defendant's attempt to exercise the right and the adverse effect upon the state caused by the delay in cases such as those in which the defendant was not substantially notified at sentencing of his right to appeal or those in which the defense attorney was at fault in failing to file or perfect a timely appeal.
The defense herein filed its motion for appeal well within the two-year period prescribed for filing an application for post-conviction relief seeking an out-of-time appeal pursuant to La. C.Cr.P. art. 924 - 930.8. Under these circumstances, remanding the case to the district court to address the timeliness of the appeal would be a waste of time and judicial resources.
Therefore, we will consider the untimely-filed motion for appeal as timely-filed application for post-conviction relief and deny the State's motion to dismiss the appeal.
CONCLUSION
Based upon the record before this court, applicable statutes and jurisprudence we find:
The defendant's convictions are affirmed;
The State's Motion to Dismiss the Appeal is denied;
The defendant's sentence for armed robbery with a firearm pursuant to La. R.S.14:64.3, is vacated and remanded for resentencing or clarification as to whether the sentence included the enhancement provision as prescribed by La. R.S. 14:64.3 ; and
The trial court is further ordered to resentence the defendant on his second degree murder conviction under the provisions of La. C.Cr.P. art. 878.1.
CONVICTION AFFIRMED; SENTENCE VACATED IN PART AND REMANDED FOR RESENTENCING

In the calls, the defendant is heard conversing with his father and denying involvement in the shooting. In another of the calls, the defendant's father cautions the defendant not to talk to anyone about his case. Additionally, the father warns the defendant that the numbers the police have on him are "bad ... 1 in 77.3 million."

The defendant stood and displayed his mouth for the jury. The defense offered this testimony to rebut the testimony of the State's witnesses that the defendant was not missing any teeth on the day of the shooting.

Second degree murder is the killing of a human being where "the offender has the specific intent to kill or inflict great bodily harm ..." La. R.S. 14.30.1. La. R.S. 14:10(1) defines specific criminal intent as: "...that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." State v. Davenport , 2016-0223 (La. App. 4 Cir. 10/18/17), --- So.3d ----, 2017 WL 4700652.
La. R.S. 14:64(A) defines armed robbery as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."

Ms. Schenck (juror # 24) and Ms. Cox (juror # 27) were members of the second voir dire panel.

Prior to its amendment in 2017, La. R.S. 15:574.4 subparagraph (E) provided that juvenile homicide offenders serving life sentences for first or second degree murder, who were indicted before August 1, 2017, as the defendant herein, were mandated to serve thirty years before being considered for parole. However, in 2017 the legislature amended La. R.S. 15:574.4 to provide that those juvenile homicide offenders serving life sentences for first or second degree murder and who were indicted prior to August 1, 2017, were covered by reenacted subparagraph (G), which reduced the number of years that must be served before the offender becomes parole eligible, from thirty-five to twenty-five years.

The defendant in this case was seventeen years old at the time of these offenses. The record lists his date of birth as July 7, 1994. Rights of an Arrestee or Suspect.

La. C.Cr.P. art. 878.1 was amended, effective August 1, 2017. Subsection (B) presently provides:
(2) If an offender was indicted prior to August 1, 2017, for the crime of ... second degree murder (R.S. 14:30.1 ) where the offender was under the age of eighteen years at the time of the commission of the offense and a hearing was held pursuant to this Article prior to August 1, 2017, the following shall apply:
(a) If the court determines at the hearing that was held prior to August 1, 2017, that the offender's sentence shall be imposed with parole eligibility, the offender shall be eligible for parole pursuant to R.S. 15:574.4(G).