Judge Regina Bartholomew-Woods
Defendant-Appellant, Cristian DeGregory ("Defendant"), appeals his conviction, by jury trial, of second degree cruelty to a juvenile, a violation of La. R.S. 14:93.2.3. In this appeal, Defendant raises several assignments of error, which we find lack merit. For the reasons that follow, we affirm Defendant's conviction and amend Defendant's sentence to remove the restriction of his parole eligibility. In all other respects, Defendant's sentence is affirmed.
STATEMENT OF THE CASE
On June 25, 2015, the State filed an indictment charging Defendant with second degree cruelty to a juvenile, a violation *905 of La. R.S. 14:93.2.3.[1] On July 22, 2015, Defendant appeared for arraignment and entered a plea of not guilty. Defendant filed motions to suppress evidence and statement. On March 31, 2016, the district court heard these motions, and on April 25, 2016, denied both of them.
Trial by jury began on June 13, 2017, and concluded on June 15, 2017; the jury returned a verdict of guilty as charged. On June 23, 2017, the district court sentenced Defendant to forty (40) years imprisonment at hard labor. On that same date, the State filed a bill of information charging Defendant as a multiple offender;[2] Defendant pled not guilty. On July 7, 2017, Defendant filed a motion to reconsider sentence. On November 21, 2017, the district court, in consideration of the pending multiple bill hearing, denied as moot Defendant's motion to reconsider.
On January 12, 2018, Defendant filed a motion for a new trial, which the district court denied. On that same date, the district court held the multiple offender hearing. On January 26, 2018, the district court ruled Defendant a second offender,[3] and vacated Defendant's sentence and resentenced Defendant to fifty (50) years imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence. It is from his conviction and sentence that Defendant now appeals.
STATEMENT OF THE FACTS
At the beginning of the jury trial, the State called Sergeant Merrell Merricks, the Custodian of Records for the New Orleans Police Department ("NOPD"). Simultaneously, the State published to the jury Defendant's call to dispatch Emergency Medical Services ("EMS"). During the call, Defendant requested emergency assistance for a six-year-old male child who was experiencing a seizure.
Next, the State called New Orleans Emergency Medical Technician Theodore *906 Andressen ("EMT Andressen"), who testified that on May 25, 2015, he was dispatched to a home located in New Orleans, and upon entry into the residence, he noticed Defendant[4] standing near a young boy who was "sprawled out on the floor," unconscious and not moving. Defendant reported to EMT Andressen that the young boy's three-year-old sister had hit him in the head with a metal lunchbox. EMT Andressen observed that the young boy had a black eye and bruises, which prompted him to call law enforcement. After placing the young boy in the ambulance and cutting off his clothes, EMT Andressen observed that the child was emaciated with a distended stomach, had cigarette burns, and his teeth had been recently knocked out or were broken. The young boy was in critical condition and transported to Children's Hospital.
Additionally, the State called Richard Fredrick ("EMT Fredrick"), a paramedic in Baton Rouge.[5] EMT Fredrick[6] explained that when he arrived, he observed a "young child, male, unresponsive" in critical condition with "irregular and rapid" breathing with periods of apnea - symptoms of a "traumatic event" as opposed to a seizure.[7] After completing a physical examination of the young boy, EMT Fredrick noted a "left nystagmus gaze, abdominal distention, and irregular respirations." EMT Fredrick also noted "multiple various stage bruising to [his] head and face" associated with blunt force and a "clubbed boxer life appearance"[8] to both ears, and superficial abrasions to both his hands and face. Ultimately, EMT Fredrick testified that he had "no doubt that [the] child would have died that day" without medical intervention.
The State next called NOPD Officer Matthew White ("Officer White"), a child abuse detective to testify.[9] Officer White stated that on May 25, 2015, he was dispatched to Children's Hospital in response to an unconscious victim, L.S.,[10] where he first spoke to the head nurse, and then to the EMTs who treated and transported him. Officer White also requested that the Crime Lab come to the hospital to photograph L.S.'s injuries. Thereafter, Officer White interviewed L.S.'s mother and relocated to L.S.'s residence where he encountered Defendant and L.S.'s younger sister; Officer White then relocated all three individuals to the NOPD Child Abuse Office. At the office, Officer White and NOPD Detective Tania Pruitt interviewed Defendant.[11] During the *907 interview, Defendant attributed L.S.'s injuries to his younger sister hitting L.S. with toys and slamming the lid of a toy box on L.S.'s hands. A search warrant was executed on the residence to "obtain any evidence pertaining to the injuries that were discussed" by Defendant during the interview; a trash bag, containing blood-stained gauze, paper towels, Q-tips and a sheet, was recovered.
NOPD Detective Eddie Williams ("Detective Williams"), who, at the time of the trial, was assigned to the digital forensics unit,[12] testified next. In connection with the child abuse investigation, Detective Williams processed and generated a data report on five (5) mobile phones that contained photos and videos of L.S.
Next, the state called Dr. Jamie Jackson, an expert in pediatric medicine, who testified that since 2010, she has worked at the Audrey Hepburn Care Center at Children's Hospital and consulted on forensic interview administered to children who are suspected of being abused; she participated as a consultant in L.S.'s forensic interview. According to Dr. Jackson, L.S. was brought to the emergency room, intubated to stabilize his breathing, and received a craniotomy[13] and X-rays;[14] Dr. Jackson explained that L.S.'s injuries signaled child abuse because such injuries require external force inconsistent with an accidental fall. Despite the fact that Defendant reported that L.S. experienced previous seizures, Dr. Jackson testified that L.S.'s medical records provided no indication that L.S. had a history of seizures.[15] While testifying, the State showed Dr. Jackson photographs of L.S.'s injuries. Dr. Jackson identified the following injuries: healing injuries (abrasion, laceration, or possibly a burn) to his lips, missing teeth, lacerations across his nose, bruising and swelling on both the left and right eyes, a gash on the left side of his face, a healing bite mark on his back, head lice, thin and malnourished appearance, repeating pattern of burn marks, cuts and abrasions to some toes, hyperpigmentation or healing bruises ("different marks all over"), avulsed or torn off fingernails, injuries to his hands and forearms, swelling and a curvature to the arm indicating an underlying injury to the arm (an acutely fractured humerus that required resetting), scraped skin, and a boxer's or wrestler's cauliflowered right ear, as well as bruises and abrasions on the left ear,[16] and symmetrical burns on both wrists and hands.
Next, Kimberly Gambel, an occupational therapist[17] at Children's Hospital, testified that on June 2, 2015, after L.S. had been medically stabilized, she began working with him. According to Ms. Gambel, L.S. was "tearful ... hesitant of being moved *908 or touched," required "total assistance to sit up, total assistance to hold up his head," and could only move the left side of his body. During therapy, L.S. had to learn to dress himself and use the toilet. Ms. Gambel further testified that when L.S. was discharged from therapy on September 2, 2015, he still required assistance with self-care tasks such as dressing, grooming, bathing, using the toilet, feeding himself, and walking (L.S. could "ambulate only short distances of about 50 feet").
The State then called NOPD Detective Tyra Pruitt, who, at the time of the underlying incident, was assigned to Child Abuse as part of the Special Victims' Unit.[18] Detective Pruitt interviewed Defendant on the day of the incident.[19] Defendant told Detective Pruitt that L.S.'s injuries were caused by a radiator, a Nerf gun, and hot water; Detective Pruitt did not believe Defendant because the injuries were too severe. On cross-examination, Detective Pruitt affirmed that she was "firmly convinced that those injuries were not caused by the three-year-old," L.S.'s younger sister.
Thereafter, the State called Matteo Avocato, a paramedic with the City of New Orleans, who testified that he was dispatched to L.S.'s home on May 10, 2015, in response to a breathing problem, but upon his arrival at the residence, Defendant cancelled the call. Consequently, Paramedic Avocato did not have contact with the patient.
Finally, the State called Linda Amos, L.S.'s adoptive mother.[20] According to Ms. Amos, prior to his injuries, L.S was a healthy, active child.[21] Ms. Amos recounted that L.S. was in a coma, hospitalized for three (3) months, paralyzed on his right side, and had to complete physical, occupational and speech therapy. Until his release from the hospital, L.S. was in a wheelchair, had to be carried everywhere, and had to wear diapers. Ms. Amos explained that now L.S. can walk, but wears a brace on his right leg and sometimes drags his right foot; wears a helmet to protect his head in case he falls; has a learning disability caused by his traumatic brain injury, which causes him to forget; does not have use of his right arm and had to learn to write with his left hand instead of his right hand; and is receiving physical and speech therapy.[22]
At the conclusion of Ms. Amos' testimony, the State rested, and the jury exited the courtroom. Defense counsel then moved for a mistrial,[23] and the district court denied that motion. Defense counsel called Defendant to testify as the sole witness. Defendant conceded that in 2007, he had been convicted of possession of stolen *909 property, a felony.[24] Defendant also conceded that he pled guilty to a misdemeanor, torturing animals.
Defendant testified that on one occasion, he and L.S.'s mother discovered that L.S. was bleeding from his nose and mouth after L.S.'s younger sister had hit him with a Nerf gun. As a result, L.S. suffered loose teeth, inner-mouth abrasions, and a swollen nose, which they treated with a mixture of mouthwash and hydrogen peroxide. Defendant stated that in February 2015, L.S. suffered a 101° fever, and a few weeks later was ill again. According to Defendant, L.S. was treated with a hot compress that burned and blistered his neck.[25] Defendant also recounted an incident in which L.S.'s younger sister struck L.S. in the face with a metal lunchbox causing a gash under his left eye; according to Defendant, L.S.'s mother treated that wound with hydrogen peroxide and medical, adhesive strips.[26]
According to Defendant, L.S., while exiting the bathtub, slipped, fell, and hit his head on the radiator. A few days later, L.S. experienced his first seizure, and Defendant requested emergency assistance; it was on this occasion that Defendant cancelled the ambulance call before the paramedic could treat L.S. On the following day, L.S.'s ear was red and swollen. Defendant testified that he was unaware of the severity of L.S.'s various injuries. According to Defendant, on May 25, 2015, L.S. suffered a seizure as Defendant was putting him to bed.
On cross-examination, Defendant explained that although he is not L.S.'s biological father, he felt responsible for his care. Defendant was unable to take L.S. for medical treatment because he did not have a car[27] and did not know L.S.'s medical insurance information, but he encouraged L.S.'s mother to bring L.S. for medical treatment. The Defense rested after Defendant's testimony.
DISCUSSION
Errors Patent
In accordance with La. C. Cr. P. art. 920,[28] we have reviewed this appeal for errors patent. A review of the record revealed one error patent. Upon sentencing Defendant as a habitual offender, the district court restricted the benefit of parole when imposing a sentence of fifty (50) years. During the sentencing, the district court stated, "Any sentence of [sic] the court hands down under the habitual offender statute is to be served at hard labor without the benefit of parole, probation or suspension of sentence." However, La. R.S. 15:529.1(G), which is applicable to sentences imposed on second and subsequent offenders, provides that the sentence imposed "shall be at hard labor without benefit of probation or suspension of sentence." Here, the district court erred in *910 restricting Defendant's parole eligibility. See State v. Falkins , 2012-1654, p. 29 (La. App. 4 Cir. 7/23/14), 146 So.3d 838, 856-57. Accordingly, we amend Defendant's sentence to remove the restriction of his parole eligibility.
Assignments of Error
In his appellate brief, Defendant assigns the following errors:
1. Whether the district court erred in failing to grant Defendant's cause challenges as to four (4) jurors;
2. Whether the district court erred in failing to grant Defendant's motion for a mistrial; and
3. Whether the district court erred in imposing an excessive sentence.
Assignment of Error Number 1 :
Defendant argues that the district court erred in denying his cause challenges as to four (4) jurors: Juror 2, Juror 6, Juror 12, and Juror 18. Defendant asserts that these jurors revealed that they could not be impartial and/or follow the law as instructed. Defendant asserts that he was forced to expend four (4) of his twelve (12) peremptory challenges on jurors who should have been stricken for cause.
In criminal matters, defendants are afforded the right of full voir dire[29] of prospective jurors and peremptory challenges of prospective jurors pursuant to La. Const. art. I § 17 (A). Further, La. C. Cr. P. art. 797, in pertinent part, allows both the State and defendant to challenge a juror for cause on the ground that the juror is not impartial or the juror will not accept the law as instructed by the court. This Court has explained that "prejudice is presumed when a challenge for cause has been erroneously denied by a trial court, and the defendant exhausts all peremptory challenges statutorily afforded to the defendant." State v. Harrison , 2017-0054, p. 17 (La. App. 4 Cir. 3/21/18), 239 So.3d 406, 417, (citing State v. Juniors , 2003-2425, p. 8 (La. 6/29/05), 915 So.2d 291, 305 ). In order "[t]o obtain a reversal, the defendant must show: (1) the erroneous denial of his challenge for cause; and (2) the exhaustion of his peremptory challenges." State v. Rhodes , 1997-1993 (La. App. 4 Cir. 11/18/98), 722 So.2d 1078, 1079. Moreover,
[a] district court is vested with broad discretion in ruling on challenges for cause, and such a ruling is subject to reversal only when a review of the entire voir dire reveals the court abused its discretion. State v. Dotson, [20]16-0473, p. 5 (La. 10/18/17), 234 So.3d 34, 39. This standard of review is utilized "because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys." Id., [20]16-0473,p. 17, 234 So.3d at 45. "Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record." Id.
State v. Lewis , 2018-0662, p. 4 (La. App. 4 Cir. 12/19/18), 262 So.3d 302, 304.
Initially, when asked whether he could be fair and impartial, Juror 2 affirmed that he could. When later asked more specifically if he could be fair in a case involving a child victim, Juror 2 responded, "I will try to be, but I'm not really sure." Further, *911 Juror 2 asserted that he could be a "good juror" in this case.
Ultimately, the State, not Defendant, exercised a peremptory challenge on Juror 2. Therefore, as to Juror 2, Defendant's argument lacks merit.
While Jurors 6,[30] 12,[31] and 18[32] expressed concerns regarding a child victim, all affirmed that they would remain fair and impartial. The Louisiana Supreme Court reasoned that a "prospective juror's responses during voir dire cannot be considered in isolation." State v. Dotson , 2016-0473, p. 5 (La. 10/18/17), 234 So.3d 34, 39 ; See State v. Frost , 1997-1771, p. 8 (La. 12/1/98), 727 So.2d 417, 426. In State v. Robinson, a prospective juror "only stated that she did not know if she could be impartial and did not affirmatively state she could not be;" this Court reasoned that the prospective juror's responses, taken as a whole, did not indicate "bias, prejudice, or an inability to render judgment according to law." 2008-0652, p. 13 (La. App. 4 Cir. 5/13/09), 11 So.3d 613, 621. Further, the Louisiana Supreme Court has reasoned that a prospective juror's equivocal answer "did not amount to a refusal to accept the law as charged." State v. Frazier , 283 So.2d 261, 264 (La.1973). Here, the answers provided by Jurors 6, 12, and 18, when taken as a whole, did not indicate that they would not be fair and impartial. Accordingly, the trial court did not err in denying Defendant's challenges for cause.
Assignment of Error Number 2:
In his second assignment of error, Defendant argues that the trial court erred in denying his motion for a mistrial. Defendant moved for a mistrial because, during opening statements, the State mentioned that Defendant's co-defendant, L.S.'s mother, pled guilty to second degree cruelty to a juvenile, and the co-defendant did not testify during Defendant's trial. Defendant further argues that the State's statement was prejudicial because the jury could reason that because the co-defendant pled guilty then Defendant must also be guilty of the charged offense.
Defendant first moved for mistrial after the State's opening statement and before the first witness was sworn. The district court declined to rule on Defendant's motion for mistrial as premature because it was not yet known whether the State would call Defendant's co-defendant to testify. At the close of the State's case-in-chief, without having called Defendant's co-defendant to testify, the State attempted to introduce into evidence the co-defendant's guilty plea form. Defendant objected, and the district court sustained Defendant's objection. Defendant again moved for a mistrial; the district court expressed that a mistrial is a drastic remedy, and instead instructed the jury that "opening statements and comments of attorneys are not evidence," and that the jury may only consider evidence properly introduced through witness testimony or exhibits.
The State argues that counsel for Defendant, during voir dire , first introduced his co-defendant's involvement in the underlying matter. The State further argues that *912 counsel for Defendant, in its opening statement, attributed L.S.'s injuries to Defendant's co-defendant. Through his testimony at trial, Defendant addressed his co-defendant's role in L.S.'s injuries and her failure to seek medical treatment for L.S.'s injuries. Additionally, the testimony of numerous witnesses addressed Defendant's co-defendant. For those reasons, the State urges that the jury was entitled to know that Defendant's co-defendant pled guilty to second degree cruelty to a juvenile.
Pursuant to La. C. Cr. P. art. 775, "a mistrial shall be ordered when prejudicial remarks in the courtroom makes it impossible for the defendant to obtain a fair trial." State v. Burton , 2009-0826, p.10 (La. App. 4 Cir. 7/14/10), 43 So.3d 1073, 1080. This Court explained "the law is well-settled that '[m]istrial is a drastic remedy that is only authorized where substantial prejudice will otherwise result to the defendant', and '[t]he determination of whether prejudice has resulted lies within the sound discretion of the trial court.' " State v. Trung Le , 2017-0164, pp. 37-38 (La. App. 4 Cir. 4/11/18), 243 So.3d 637, 668, writ denied , 2018-0741 (La. 1/18/19), 262 So.3d 285, and writ denied , 2018-0755 (La. 1/18/19), 262 So.3d 286 (internal citations omitted). This Court has "emphasized that cautionary instructions by the trial court are both essential and effective in avoiding prejudice where the fact of a co-conspirator's guilty plea is brought out at a trial before a jury." State v. Isaac , 487 So.2d 565, 570 (La. App. 4th Cir. 1986). Here, although the State mentioned Defendant's co-defendant's guilty plea, other witnesses made reference to Defendant's co-defendant as it related to L.S.'s injuries. Further, Defendant's co-defendant's guilty plea form was not admitted into evidence, and the district court instructed the jury to disregard the State's comments regarding the co-defendant's guilty plea. Considering the overwhelming weight of evidence presented against Defendant through exhibits and witnesses' testimony and the discretion afforded the district court in determining whether prejudiced resulted, we find no abuse of discretion in the district court's denial of Defendant's motion for mistrial. For those reasons, Defendant's assignment of error lacks merit.
Assignment of Error Number 3:
In Defendant's third assignment of error, Defendant alleges that he received an excessive sentence. Following his conviction the district court sentenced Defendant to forty (40) years at hard labor, the statutory maximum sentence. After adjudicating Defendant a second offender, the district court resentenced him to fifty (50) years at hard labor. Although Defendant concedes that the district court did not impose the statutory maximum sentence of a second habitual offender and the sentence comports with the parameters of La. R.S. 15:529.1, Defendant nevertheless argues that his sentence is excessive. Defendant contrasts his sentence to the twenty (20) year sentence that his co-defendant, L.S.'s mother, received and argues that she bore more responsibility for L.S.'s injuries.
A review of the record reveals that Defendant failed to properly preserve this assignment of error for review on appeal. Defendant filed a motion to reconsider his initial sentence, but failed to both object to and file a motion to reconsider his sentence as a second offender. This Court has explained that pursuant to La. C.Cr.P. art. 881.1,[33] "[a]bsent the filing of a timely written *913 motion for reconsideration of sentence or making of an oral objection at the sentencing hearing, a defendant is precluded from urging on appeal any ground of objection to the sentence." State v. Kirkling , 2004-1906, p. 5 (La. App. 4 Cir. 5/18/05), 904 So.2d 786, 790.[34] This Court further explained that "[t]he jurisprudence has construed Article 881.1 as requiring a defendant who is multiple billed to file separate motions to reconsider his initial sentence and his new sentence imposed after his multiple bill adjudication." Kirkling , 2004-1906, p. 6, 904 So.2d at 790. Because Defendant failed to object to and file a motion to reconsider his sentence as a second offender, appellate review of Defendant's sentence is "limited to a bare review for constitutional excessiveness." State v. Zeitoun , 2017-0366 (La. App. 4 Cir. 11/8/17), 231 So.3d 934, 945, writ denied , 2017-2034 (La. 6/1/18), 244 So.3d 435.
Excessive sentences are prohibited by La. Const. Art. I, § 20. This Court has reasoned that "[a]lthough a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment." State v. Lambert , 15-0629, p. 22 (La. App. 4 Cir. 3/16/16), 191 So.3d 630, 644. Further, "[a] sentence is unconstitutionally excessive when it imposes punishment grossly out of proportion to the severity of the crime, makes no measurable contribution to acceptable goals of punishment, or constitutes nothing more than needless infliction of pain and suffering." State v. Turner , 2018-0326, p. 6 (La. App. 4 Cir. 11/28/18), 259 So.3d 1089, 1093-94. When reviewing whether a sentence is excessive,
an appellate court must determine first whether the trial court adequately complied with the statutory guidelines in La. C.Cr.P. art. 894.1. State v. Martin , [20]13-0628, p. 17 (La. App. 4 Cir. 5/28/14), 141 So.3d 933, 944. If the appellate court finds adequate compliance with La. C.Cr.P. art. 894.1, then it must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, "keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." State v. Batiste , [20]06-0875, p. 18 (La. App. 4 Cir. 12/20/06), 947 So.2d 810, 820 (quoting State v. Landry , [20]03-1671, p. 8 (La. App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239 ). "The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." La. C.Cr.P. art. 881.4. Moreover, "[a] trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion." State v. Hackett , [20]13-0178, p. 14 (La. App. 4 Cir. 8/21/13), 122 So.3d 1164, 1174 *914 (quoting State v. Smith , [20]01-2574, pp. 6-7 (La. 1/14/03), 839 So.2d 1, 4.). "On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion." Id.
Id. , 2018-0326, pp. 6-7, 259 So.3d at 1094.
The Habitual Offender Law, La. R.S. 15:1529.1, establishes the sentencing range for a second felony offender, such as Defendant, as half of the maximum to twice the maximum sentence for the underlying offense, with no benefit of probation or suspension of sentence. Here, the maximum sentence for second degree cruelty to a juvenile is forty (40) years imprisonment at hard labor. Accordingly, the sentencing range for a second felony offender is twenty (20) to eighty (80) years imprisonment at hard labor without the benefit of probation of suspension of sentence. The district court sentenced Defendant, as a second felony offender, to fifty (50) years, far below the maximum sentence of eighty (80) years imprisonment at hard labor. In sentencing Defendant, the district court considered the severity of L.S.'s injuries, which included an abrasion or laceration to his lips, broken or missing teeth, lacerations across his nose, bruising and swelling on both his left and right eyes, a gash on the left side of his face, a healing bite mark on his back, head lice, thin and malnourished appearance, burn marks, cuts and abrasions to some toes, hyperpigmentation or healing bruises, avulsed or torn off fingernails, injuries to his hands and forearms, swelling and an acutely fractured humerus that required resetting, scraped skin, and boxer's or wrestler's cauliflowered right ear, bruises and abrasions on the left ear, and symmetrical burns on both wrists and hands, the lasting impacts of these injuries that include wearing a brace on his right leg that causes him to sometimes drag his right foot, wearing a helmet, a learning disability caused by his traumatic brain injury, the loss of use of his right arm and a continued need for both, physical and speech therapy. For these reasons, we find that Defendant's sentence is not excessive, and this assignment of error lacks merit.
CONCLUSION
For the aforementioned reasons, we affirm Defendant's conviction and amend Defendant's sentence to remove the restriction of his parole eligibility. In all other respects, Defendant's sentence is affirmed.
AFFIRMED AS AMENDED

La. R.S. 14:93.2.3 provides:
A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.
(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.
B. The providing of treatment by a parent or tutor in accordance with the tenets of a well-recognized religious method of healing, in lieu of medical treatment, shall not for that reason alone be considered to be intentional or criminally negligent mistreatment or neglect and shall be an affirmative defense to a prosecution under this Section.
C. Whoever commits the crime of second degree cruelty to juveniles shall be imprisoned at hard labor for not more than forty years.

Pursuant to its notice of La. C.E. art. 404(B) evidence of prior crimes, the State called Joshua Mueller ("Mr. Mueller"), an SPCA Law Enforcement Investigator for the Humane Society in Rochester, New York, to testify. At trial, Mr. Mueller testified that he had arrested Defendant for aggravated cruelty to animals after Defendant admitted that he punched his girlfriend's ten (10) week old pit bull puppy and broke its jaw. Ultimately, Defendant pled guilty to torturing animals, a misdemeanor in Monroe County, New York. The district court administered a limiting instruction regarding the purpose of prior crimes evidence.

The State filed a multiple bill of information charging Defendant as a triple habitual offender. The district court found that the State failed to prove, pursuant to State v. Shelton , 621 So. 2d 769 (La. 1993), that Defendant was advised of his constitutional rights and knowingly waived those rights in his plea of guilty to unauthorized use of a moveable. Accordingly, the district court adjudged Defendant a second habitual offender.

EMT Andressen identified Defendant in open court.

On May 25, 2015, EMT Fredrick was employed as an EMT in New Orleans and was dispatched to the residence with his partner, EMT Andressen.

EMT Fredrick identified Defendant in open court.

EMT Fredrick testified that the child did not appear to be actively experiencing a seizure or recovering from a recent seizure.

EMT Fredrick explained that "boxer ears" are "a clubbing and cauliflower effect that is predominately seen in boxers that have sustained multiple injuries to the head while they're fighting, and it's a clinical sign of over time blunt force trauma to the ears and the head or the face."

Officer White explained that, as a child abuse detective, he "conduct[s] investigations with juveniles that consist of cruelty, neglect, sexual abuse [,] and sometimes homicides."

In this opinion, the initials, rather than the full name of, the minor child are used to protect and maintain the privacy of the minor child involved in this proceeding. See Uniform Rules, Courts of Appeal, Rule 5-1 and Rule 5-2.

The interview was audio and video recorded.

According to Detective White, the NOPD digital forensics unit "[p]rocess[es] all phones, videos computer devices, ... that may contain evidence."

On the craniotomy procedure, a portion of L.S.'s skull was removed to accommodate the swelling of his brain and several subdural hematomas.

The X-rays revealed a broken posterior rib, which was in the process of healing and suggested that the rib had been broken at least seven (7) to ten (10) days earlier.

Dr. Jackson testified that a sudden onset seizure could be caused by trauma, a tumor, an electrolyte imbalance, or epilepsy, but L.S. should have been medically evaluated and treated.

Dr. Jackson testified that the damage to L.S.'s ears signaled non-accidental trauma or abuse.

Ms. Gambel explained that an occupational therapist is "an allied health professional who focuses on restoring function to individuals so that they can participate in everyday activities."

Detective Pruitt assisted Detective White, who was the lead investigator assigned to this case.

The interview was recorded and played in open court at trial. Detective Pruitt explained that in a case where an injured child is unable to speak for himself, the police will interview anyone who had contact with the child on the date that the injuries were sustained.

Ms. Amos explained that her son, Avery, had a relationship with L.S.'s mother and fathered L.S.'s younger sister. Ms. Amos has known L.S. since his birth.

Ms. Amos did not know L.S. to ever have seizures.

Due to issues with insurance coverage, L.S.'s occupational therapy had recently been discontinued.

The basis for Defendant's motion for mistrial is addressed in the Discussion section of this opinion under the Assignment of Error Number 2 heading.

According to Defendant, he was sentenced to one (1) year in County D.O.C.

Defendant denied that L.S.'s burns had been caused by cigarettes.

Defendant explained that he had suggested that L.S.'s mother bring L.S. to the hospital after some injuries, but she ultimately declined.

Notwithstanding his lack of transportation, Defendant testified that they lived within walking distance from both Touro and Ochsner Hospitals.

La. C. Cr. P. art. 920 provides:
The following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.

The Louisiana Supreme Court explained that "[v ]oir dire examination of prospective jurors is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges. The questions propounded are designed to determine any potential adverse influence on the prospective juror's ability to render an impartial verdict." State v. Dotson , 2016-0473, p. 5 (La. 10/18/17), 234 So.3d 34, 39 (citing State v. Drew , 360 So.2d 500, 513 (La. 1978) ).

Juror 6 expressed that the age, and corresponding degree of helplessness, of the child victim "would be a factor," but affirmed that he would be able to be fair, impartial, and apply the law "so charged."

Juror 12 expressed that "it would be very hard if the child testifies," and she might "believe the child more than an adult." However, Juror 12 affirmed that she could remain fair and impartial.

When asked if she would be a "good juror in this case," and whether she "would be fair and impartial," Juror 18 affirmed that she would try.

La. C. Cr. P. art. 881.1 provides, in pertinent part:
A.(1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
...
B. The motion shall be oral at the time of sentence or shall be in writing thereafter and shall set forth the specific grounds on which the motion is based.
...
E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

This Court further explained that "[s]tated otherwise, 'the failure to object to the sentence as excessive at the time of sentencing or to file a written motion to reconsider sentence precludes appellate review of the claim of excessiveness.' " Id. (citing State v. Robinson, 1998-1606, p. 9 (La. App. 4 Cir. 8/11/99), 744 So.2d 119, 125 ).